IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(BALTIMORE)

HOWARD RICE                          )   CRIMINAL NO.:  1:04-CR-00323-WDQ
(Movant/Petitioner)                  )
                                     )   D.J. WILLIAM D. QUARLES, JR.
        vs.                          ) .
                                     )        WDQ  12-cv-3648
UNITED STATES OF AMERICA             )
(Respondent/Government)              )

MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S
28 U.S.C. 2255(f)(4) MOTION

## I.  PRELIMINARY MATTERS

Let the record reflect that hereinafter, all references to the Movant -
Defendant shall be that of "Petitioner," and that all exhibits which comprise
Petitioner's appendix of exhibits in support of Petitioner's 2255 motion shall
be referenced hereinafter as "Ex."  As Petitioner composes the instant pleading
in a pro se layman capacity, the instant pleading should be construed liberally
pursuant to the liberal pleading rule enunciated in Haines v. Kerner, 404 U.S.
519 (1972). (See Noble v. Barnett, 24 F.3d 582, 587 n.6 (4th Cir. 1994)  Let the
record reflect further that the instant pleading must not be viewed as a "second
or successive" 2255 pursuant to 28 U.S.C. 2255(h) or 28 U.S.C. 2244, as the claim
which embodies Petitioner's thrust herein has only been birthed recently, years
after Petitioner could have filed an initial 2255 motion.  Let the record also
reflect that Petitioner's claim asserted herein, infra, has been properly filed
within the purview of 28 U.S.C. 2255(f)(4) (previously 2255 paragraph 6(4)), as
will be definitively illustrated, infra.  Petitioner's claim is patently meritorious
within the parameters of 28 U.S.C. 2255(a), as Petitioner's main thrust is that
of 5th Amendment Constitutional Due Process, a violation of such.  Moreover,
Petitioner's claim has been asserted in good faith, consistent with the stare
decisis of Townsend v. Burke, 334 U.S. 736, 741 (1948), Mesarosh v. U.S., 352 U.S.

1, 9 (1956) ("The dignity of the United States Governemnt will not permit the conviction of any person on tainted testimony."), et alia.  Petitioner herein respectfully requests that discovery procedures be utilized to expand the record pursuant to Rules 6 and 7 Governing Section 2255 Proceedings to fully develop and add luster to Petitioner's claim.  Pursuant to Rule 8 of the Rules Governing 2255 Proceedings, Petitioner respectfully requests an evidentiary hearing so that comprehensive adjudication may be alloted, and to confidently conclude if whether the government knowingly used perjury in the instant case or false evidence and or failed to correct said perjury/false evidence after the government had discovered as much. (See U.S. v. Agurs, 427 U.S. 97 (1976);  Napue v. Illinois, 360 U.S. 264 (1959).)

## II.  FACTS

On approx. February 19, 2004 Petitioner was indicted and charged with conspiracy to distribute heroin with his brother Raeshio Rice, pursuant to 21 U.S.C. 841(a)(1) and 21 U.S.C. 846. (See cause 1:04-CR-0084-BEL, Doc. 1)  Pursuant to a plea agreement, Petitioner pled guilty to count 1 of said indictment, on approx. June 1, 2004. (See Doc. 31, 1:04-CR-0084)  It was Petitioner's, and his then counsel's belief, that upon Petitioner's acceptance of said plea, that Petitioner would not further be prosecuted thereafter for any crimes by the government of the Maryland venue. (See Ex. 1, pgs. 4-5 of May 6, 2004 Plea Agreement; see also Ex. 2, pgs. 5-8 of 10/13/06 Memorandum Opinion and Order.)  This plea immunity belief was the subject of much debate, as Petitioner's brother, as well as his brother's defense counsel, Peter Ward, also believed that by pleading guilty that his client would also receive immunity shielding criminal prosecution from any other offenses. (See Ex. 2, pgs. 2-4)  Neither pleas offered to the Rice brothers enunciated any upward departure for being a leader/organizer of criminal activity pursuant to U.S.S.G. 3B1.1. (See Ex. 1 pg. 4 Sections 6-8; see also Ex. 2 pgs. 2-8, viz., pgs. 2, 6), a material fact in the instant case.

Subsequent to the acceptance of the plea agreements by the Rice brothers and their sentencings, on February 1, 2005 a Superseding Indictment was filed against the Rice brothers, et alia, charging twenty (20) counts, alleging Racketeering, murder, distribution of now cocaine, heroin, conspiracy, inter alia. (See Doc. 20, 1:04-CR-0323-WDQ)  Thereafter, on October 11, 2005 a Secondd Superseding Indictment (Superseding references, hereinafter "S.S.") was filed against the Rice brothers, et alia, charging Racketeering, inter alia.  In response thereto, on January 26, 06 the Rice brothers filed a motion to dismiss the S.S. Indictments and to Enforce the Plea Agreements which they had previously accepted and were sentenced upon.  (Doc. 249)  An evidentiary hearing was held on 6/26/06 and 9/8/06 to adjudicate the Rice brother's motion to dismiss.  On 10/13/06, D.J. Quarles, Jr. denied the Rice brother's motion to dismiss. (See Doc. 370)  Later on the same day, a 21 U.S.C. 851 Information was filed against Petitioner alleging a prior drug conviction for enhancement purposes.  By October 16, 2006 a total of four (4) S.S. Indictments were filed against Petitioner, et alia, charging Racketeering offenses, inter alia.  (See Doc. 374)  On October 19, 2006 Petitioner reluctantly pled guilty to counts 1 thru 3 of the 4th S.S. Indictment, and a 1 count Information alleging 1 kilogram of heroin or more distribution conspiracy, the latter, and conspiracy to distribute 5 kilograms or more of cocaine, the former; because Petitioner did not want to face a life sentence pursuing a jury trial, based upon mendacious information which he could not readily prove.  (It should be noted that Petitioner asserts, for factual purposes that it is highly questionable as to legality, for Petitioner to had pled guilty to count 1 of a Felony Information alleging conspiracy to distribute 1 kilogram or more of heroin and to counts 1 thru 3 of the 4th S.S. Indictment, when counts 1 & 2 of the 4th S.S. Indictment allege the same offense in part as count 1 of the Felony Information, to wit, conspiracy to distribute heroin;)  By pleading guilty to a Felony Information a defendant waives an indictment, (See Ex. 8, F.R.Crim.P. 7(b)),

3

the 5th Amendment Grand Jury indictment requirement.)  On approx. October 19,
2006 Petitioner was, ergo, sentenced to 30 years imprisonment, inter alia.

On January 26, 2011 a defendant in an unrelated case by the name of Darnell
Anthony Young had his sentencing hearing.  Mr. Young's 1/26/11 sentencing hearing
is relevant to the instant case because thereat, Eric Clash, a/k/a "Whiteboy,"
andindividual who was alleged to be a lieutenant in what was alleged as the "Rice
Organization" (Clash was charged as on of Petitioner's codefendants) (See Ex. 4),
testified as a material witness at Young's 1/26/11 sentencing. (See U.S. v. Young,
WDQ-06-0491, Doc. 96, 1/26/11 sentencing transcript, filed 3/29/11 – Ex. 5)  From
Clash's 1/26/11 testimony it is illustrated that Petitioner distributed 4.5 – 9
ounce quantities of cocaine to Clash for only part of 1998 and that by October
1998, that Petitioner's cocaine supply dried up, whereafter, Clash could not secure
a supply of cocaine pretty much until 2000, when he began dealing with his (Clash's)
cousin Anthony Leonard and met a Los Angeles Mexican supplier.  Once Clash secured
his new Los Angeles supplier, Clash became his "own man," distributing cocaine
to Young, et alia.  By October of 2000, Clash's supply of cocaine dried up, which
compelled him to open up a bar with Petitioner for about 2 years, at which Young
worked as a disk jockey.  Young and Travis Golder did cocaine transactions at this
time, which Petitioner and Clash were not involved in at all.  By early 2002,
Clash had secured a cocaine supply from his Los Angeles supplier again, and the
first shipment in early 2002 involved 50 kilograms, at which time Clash began to
supply Petitioner as one of Clash's customer's (Ex. 5, s-22) until July of 2002
apparently.  Clash attempted to stop dealing drugs in July of 2002, until a 200
kilogram cocaine shipment arrived in the fall of 2002. (Ex. 5, S-25)  Clash took
50 kilograms of the 200 kilograms and distributed them to Travis Golder and Darnell
Young. (Ex. 5, S-26 – S-27)  Petitioner recieved **none** of the 200 kilograms of
cocaine whatsoever because Clash made the "executive decision" to withold supply
from Petitioner, and instructed Golder and Young to keep their supplier a secret

4

from Petitioner, because Clash asserted that Petitioner and his brother were too
flashy, bringing on "too much heat" driving fancy cars. (Ex. 5, S-27)  Even after
Petitioner was arrested in early 2004, Leonard and Clash continued to distribute
cocaine together, until Clash's arrest in February 2005.  Clash pled guilty to
conspiracy to distribute 1,500 kilograms or more of cocaine, cooperated with the
government, and received only a four (4) year prison sentence.  (Ex. 5, S-38, S-40)
Darnell Young was sentenced to 188 months imprisonment on 1/26/11.

In August of 2012, Darnell Young communicated to a family acquaintance of
Petitioner's that he (Young) had heard that Petitioner was given 30 years for
being a leader over Clash, and that Petitioner pled guilty to hundreds of kilograms
of cocaine.  Young conveyed to Petitioner's faily acquaintance that Clash testified
at his (Young's) 1/26/11 sentencing hearing to things that he (Young) believed
would help Petitioner in his case.  This provided cause for Petitioner to obtain
Young's 1/26/11 sentencing transcripts to view their possible probative value.
By September 2012, Petitioner had obtained Darnell Young's 1/26/11 sentencing
transcript (Ex. 5) and has been composing the instant 2255(f)(4) petition ever since.

## III.   ARGUMENT/CLAIMS

### A.  PETITIONER'S PETITION IS PROPER WITHIN THE PURVIEW OF 28 U.S.C. 2255(f)(4), AND MUST NOT BE TREATED AS A SECOND OR SUCCESSIVE PETITION PURSUANT TO 2255(h).

Quite commonplace, it is, for a district court to construe a second or
subsequent 28 U.S.C. 2255 petition filed by a petitioner as a "second or successive"
2255 within the purview of 29 U.S.C. 2244 and 2255(h), viewing the term "second or
successive petition" literally as a seemingly prophylactic measure in light of
AEDPA legislation.  Per contra, not every "second or subsequent" 2255 petition
filed by a petitioner constitutes a "second or successive" 2255 petition within the
scope of 2244 and 2255(h).  This concept, or reality rather, is now hornbook law,
as courts have almost uniformly rejected that literal reading of "second or
successive.'" (See In re Cabey, 429 F.3d 93 (4th Cir. 2005) ("This Circuit (4th

Circuit) and others have held instead that it (term second or successive) is a term of art.") Id. (See Slack v. McDaniel, 529 U.S. 473, 486 (2000) ("The phrase 'second or successive petition' is a term of art..."); see also Galka v. Caruso, 599 F.Supp.2d 854, 856 (E.D.MI 2009) (citation omitted)) "Rather, the term is intended to implement the abuse-of-writ doctrine." Id. (citing In Re Bowen, 436 F.3d 699, 704 (6th Cir. 2006))

Noted by the court in In Re Taylor, 171 F.3d 185 (4th Cir. 1999) when considering the meaning of "second or successive" was the fact that "Congress did not write upon a clean slate when it enacted the AEDPA." Id., at 187 (quoting U.S. v. Texas, 507 U.S. 529, 534 (1993) Instead, "AEDPA 'codified and extended judicially construed limits on the consideration of second and successive applications for collateral relief.'" Id. (quoting In re Vial, 115 F.3d 1192, 1194 (4th Cir. 1997) (en banc).) Specifically, the 4th Circuit opined that in the context of a Section 2244(b) motion seeking authorization to file a successive application, AEDPA incorporated longstanding habeas practice such as the "abuse of the writ" doctrine. (See In re Williams, 364 F.3d 235, 239 (4th Cir. 2004)) The abuse of the writ doctrine generally precluded a federal court from considering claims presented in a successive application unless the applicant could demonstrate cause and prejudice. Id. Under the doctrine, codified by AEDPA, "a claim which did not arise until after a prior petition was filed would not be barred as 'second or successive.'" Taylor, 171 F.3d at 187. (See also In re Cabey, 429 F.3d 93 (4th Cir. 2005) ("We have therefore concluded in prior cases that a petition which 'expressly seeks to raise only those issues that originated... after [petitioner's] first 2255 petition had been granted'" is not 'second or successive' for purposes of AEDPA.") (citing Slack, at 486-87) Per contra, "a petition is considered successive if it raises a claim that could have been raised in the first petition but was not so raised, either due to deliberate abandonement or inexcusable neglect." (Galka v. Caruso, supra, at 856 (quoting In re Bowen, at 704). "There-

fore, if the prisoner could have discovered the factual predicate to his new claim at the time her filed his first petition, the petition is successive within the meaning of 28 U.S.C. 2244(b)(3)(A)." Id. (citing In re Siggers, 132 F.3d 333, 338 (6th Cir. 1997))

Succinctly uttered, whether a subsequent 2255 petition is a true "second or successive petition," vel non, turns toward the facts which comprise the claims which comprises the subsequent petition, the date of birth" and discovery of those facts, which is material and dispositive in the "second or successive petition" assessment.  For if the facts which comprise a new claim were not available until after the initial 2255 petition was filed/denied, this then keys the availability of 28 U.S.C. 2255(f)(4) as the vehicle to advance said claim(s).  28 U.S.C. 2255 (f)(4) states with particularity:  "A 1-year period of limitation shall apply to a motion under this section.  The limitation period shall run from the latest of... (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." [sic]  It is apparent that the availability of 28 U.S.C. 2255(f)(4) (formerly 2255 paragraph 6(4)) to thrust claims that were unavailable at the time of theeinitial 2255 filing due to unavailable facts/evidence to substantiate the claim is consistent with the meaning of "cause" ("some objective factor external to the defense") within the habeas context. (See Murray v. Carrier, 477 U.S. 478, 488 (1986) ("The existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel... Without attempting an exhaustive catalog of such objective impediments to compliance with a procedural rule, we note that a showing that the factual or legal basis was not available to counsel... would constitute cause under this standard.")

In the case sub judice, after muster of the facts which comprise the instant petition, it is unequivocal that Petitioner's subsequent 2255 petition has been

properly filed pursuant to 28 U.S.CK 2255(f)(4), and is not a "Second or successive petition." Petitioner was sentenced to 360 months imprisonment, inter alia, on approx. October 19, 2006. As Petitioner did not fide a notice of appeal within 10 days subsequent to being sentenced, Petitioner's deadline to file a 28 U.S.C. 2255 motion pursuant to the AEDPA statute of limitations expired on approx. October 29, 2007. Notably, Eric Clash's testimony at Darnell Young's January 26, 2011 sentencing hearing (which is the womb which birth's Petitioner's 5th Amendment Due Process violation and actual innocence claim) was approx. 39 months after Petitioner's AEDPA limitation period expired. Being materially dispositive, of course, is the fact that Petitioner's availability of his now advanced 5th Amendment Due Process and actual innocence claim came years (more than 3 years) after the expiration of the 1 year limitation period for filing Petitioner's initial 2255 motion, a fact which unequivocally illustrates that the claim is cognizable within the garb of 2255(f)(4) and that his asserted claim herein is claerly not to be diagnosed as a "second or successive petition." It is vivid, more than not, that 2255(f)(4)'s availability to Petitioner's such as the movant is consistent with the spirit of "cause" in the habeas context, to wit, "some objective factor external to the defense," viz, when "the factual or legal basis for a claim was not reasonably available..." (Murray v. Carrier, 477 U.S. 478, 488 (1986) (citing Reed v. Ross, 468 U.S. 1, 16 (1984)) The foregoing, in toto, permits this Honorable Court to proceed now to the spirit and gravamen of Petitioner's merits.

## B. PETITONER WAS SENTENCED ON THE BASIS OF MATERIALLY INCORRECT INFORMATION, VIOLATING DUE PROCESS. (FIFTH AMENDMENT DUE PROCESS VIOLATION CLAIM.)

Townsend v. Burke, 334 U.S. 736 (1948) is that of hornbook law, enunciating that for a defendant to be sentenced on the basis of materially incorrect information, "whether caused by carelessness or design, is inconsistent with due process of law, and such a conviction cannot stand." Id. at 741. "A sentence that's based on erroneous information is also illegal." Currence v. Cartledge,

2010 U.S. Dist. Lexis 22684 (D.C. S. Carolina 2010) (citing <u>Townsend</u>, at 741)
"A criminal defendant 'clearly has a right not to be sentenced on the basis of
misinformation of a constitutional magnitude.'" <u>Hammonds v. Johnson</u>, 2009 U.S.
Dist Lexis 116876 (W.D.Va. 2009) (citing <u>U.S. v. Bowman,</u> 926 F.2d 380, 382 (4th
Cir. 1991) "If the government offered unconstitutionally unreliable evidence,
the court would exclude that evidence... because it would 'unfairly prejudice'
the defendant." <u>U.S. v. DesAnges</u>, 921 F.Supp. 349, 355 (W.D.Va. 1996) (citing
<u>Townsend</u>, at 741.) "Evidence at sentencing is subject to the due process
standard of reliability." <u>Id.</u> "A fair sentencing requires a much broader range
of information than does trial." <u>Id.</u>, at fn. 4)

"Not every mistake of fact by a sentencing judge is of a constitutional
magnitude.  For a mistake to rise to the level of a due process violation, two
criteria must be met:  the fact or assumption must be (1) false or unreliable and
(2) demonstrably made the basis for the sentence." <u>Jefferson v. Berkebile</u>, 688
F.Supp.2d 474, 485 (S.D.W.Va. 2010) (citing cases); <u>U.S. v. Tucker,</u>  404 U.S.
443 (1972)) "If there is no evidence of false information, the petitioner's due
process claim will fail." (See <u>Currence</u>, supra)  A fortiori, it must be remembered
that "the dignity of the United States Government will not permit the conviction
of any person on tainted testimony." <u>Mesarosh v. U.S.</u>, 352 U.S. 1, 9 (1956)

Petitioner requests that this Honorable Court take Judicial Notice, pursuant
to F.R.Evid. 201(d) of the following adjudicative facts that are not reasonably
suseptible to dispute:
(1) That Petitioner was alleged to be the leader of the "Rice Organization,":"<u>at
all times</u>" (viz., from 1995-2004) as per the 1st thru 4th S.S. Indictments in re
cause WDQ-04-0323. (See Ex. 4, pg. 2, paragraph 2)
(2) That Eric Clash, a/k/a "Whiteboy" was alleged to be a lieutenant in the "Rice
Organization," "<u>at certain times</u>" (no specificity in re date) as per the 1st thru
4th S.S. Indictments in re case number WDQ-04-0323) (See Ex. 4, pg. 2, paragraph 4)

9

Petitioner reluctantly pled guilty on approx. October 19, 2006 to 5 kilograms or more of cocaine (specifically, more than 150 kilograms - see Ex. 3, pg. 7 Section b(3), 10/17/06 plea agreement) and 1 kilogram or more of heroin (see Ex. 3, pg. 1 paragraph 1) and to being the leader of criminal activity, summoning a 4 point upward departure pursuant to U.S.S.G. 3B1.1(a) (See Ex. 3, pg. 7, Section b(5)) because he feared receiving a life sentence due to mendacious assertions by government witnesses which Petitioner could not readily prove to be false at the time.  But today, the lies which serves as the adhesive to Petitioner's 30 year prison sentence, find no safe haven from the truth.  Material to the resolve of the instant petition, is the January 26, 2001 testimony of Eric Clash at Darnell Young's sentencing hearing, (Ex. 5) which boasts a hoard of evidence establishing that Petitioner was sentenced to 30 years based upon materially untrue information, viz., more than 150 kilograms of cocaine, a 4 point leader enhancement, and 30 kilograms of heroin.

Specifically, Eric Clash, more than 4 years after Petitioner was sentenced to 30 years imprisonment, testified on 1/26/11 that he (Clash) met Petitioner in 1997. (Ex. 5, pg. S-8 @ 15-19)  Clash testified that he was getting between 4.5 - 9 ounces of cocaine at a time from Petitioner in 1998. (Ex. 5, pg. S-8 @ 1-6) Clash testified that in late 1997 or early 1998 that he met Darnell Young and to his knowledge that Young and Petitioner had no drug involvement, (Ex. 5, S-10 - S-11) and that Clash himself started selling cocaine to Young approx. the Spring of 1998 in 4.5 ounce quantities, and 9 ounce quantities toward the end of 1998. (ex. 5, pg. S-11 @ 9-25)  Clash further testified that in approx. October 1998 that his cocaine supply dried up, (Ex. 5, pg. S-13 @ 2-6) and that from the Spring to Fall of 1998 that he sold Young approx. 3 kilograms of cocaine. (Ex. 5, pg. S-13 @ 10-13)  Clash continued on about how he lacked a supply of cocaine from October 1998 through most of 1999, and that he sold no cocaine to Young in 1999. (Ex. 5, pg. s-13 @ 21-21)  Next, Clash testified that at the end of 1999 that he

identified a new cocaine supplier, his cousin Anthony Leonard, and that Leonard's supply came from Mexican's in Los Angeles. (Ex. 5, pg. S-14 - S-15)  Clash testified that he received much larger quantities from the Los Angeles supplier than he ever obtained from Petitioner. (Ex. 5, pg. S-15 @ 8-13)  Clash testified that he then began to distribute cocaine to Young again around the Spring of 2000 in kilogram quantities. (Ex. 5, pgs. S-15 - S-16)  Clash then testified that his supply again dried up around October of 2000. (Ex. 5, pg. S-17 @ 14-19)  Clash testified that from the Spring of 2000 until October of the same year that he sold Young between 10 - 15 kilograms of cocaine. (Ex. 5, pg. S-18 @ 5-13)  Clash further testified that after his cocaine supply dried up in 2000, he opened a business (bar) with Petitioner in the fall of 2000, until 2002 and that Young was the disk jockey at said business. (Ex. 5, pgs. S-18 - S-19)  Clash testified that during that time frame, that Travis Golder and Young were involved in cocaine deals together, that he had nothing to do with such, that Clash did not sell cocaine to Young in 2001, and that he (Clash) only was selling a "little bit" of heroin at the time.  (Ex. 5, pg. S-20 - S-21)

Clash further testified at said 1/26/11 hearing that in early 2002, that his Los Angeles supplier began supplying him again with cocaine, and that Clash received 50 kilograms from said supplier in the first shipment, but did not state who he distributed the 50 kilograms to. (Ex. 5, pg. S-21 - S-22)  Clash stated that in 2002 after reuniting with his Los Angeles supplier, that he (Clash) supplied Petitioner briefly, but did not state in what quantity/frequency. (Ex. 5, pg. S-22 @ 12-14)  Clash testified that by July of 2002 he (Clash) was completely done selling drugs because he didn't want to sell drugs anymore, and therefore introduced Travis Golder to his (Clash's) cousin Anthony Leonard to serve as Golder's supplier. (Ex. 5, pg. S-25 @ 3-14)  However, Clash then testified that in the fall of 2002 that he (Clash) and Leonard received 200 kilograms of cocaine for distribution, and that Clash took 50 of the 200 kilograms and distributed them to Golder and Young. (Ex. 5, pgs. S-25 - S-27)  Most telling, however, is the fact that

Clash testified that neither Petitioner or his brother Raeshio Rice received none of the 200 kilogram shipment, because Clash himself determined that Petitioner and his brother were too flashy, "bringing on a lot of heat with fancy cars and things like that," and Clash decided not to deal with the Rice brothers for fear of ending up in prison due to the Rice brother's alleged ostentacious lifestyle. (Ex. 5, pgs. S-27 @ 13-25 - S-28 @ 1-8)  Furthermore, Clash testified that he (Clash) instructed Young that if Petitioner or his brother asked Young where he (Young) got the large quantities of cocaine from, to tell the Rice brothers that Young obtained the cocaine from an individual named Clyde, to conceal the fact that Clash in fact was the supplier of such and that Clash had actually decided to cut off Petitioner's supply. (Ex. 5, pg. S-28 @ 9-16)  Clash afterwards admitted via his testimony that he pled guilty and stipulated to a quantity of cocaine consisting of 1,500 kilograms, an astronomical quantity. (Ex. 5, pg. S-38 @ 1-7)

Eric Clash's 1/26/11 testimony more than 4 years after Petitioner's sentencing is of monumental import in unveiling that Petitioner was sentenced based upon materially false information.  First, from Clash's testimony any onlooker can view that Petitioner was not "at all times" from 1995 - 2004 the leader of the alleged "Rice Organization" (See Ex. 4, pg. 2 paragraph 2) and that Eric Clash was not a lieutenant in the "Rice Organization," (Ex. 4, pg. 2 paragraph 4) but was arguably a leader/organizer himself.  As Clash's testimony unveils, he has a very brief buyer relationship with Petitioner in 1998 where Petitioner allegedly sold Clash 4.5 to up to 9 ounce quantities of cocaine until October 1998 when Petitioner's apparent supply of cocaine dried up (See Ex. 5 pg S-10 @ 1-6, S-13 @ 2-6), a relationship between Petitioner and Clash that is a far cry from qualifying Clash as a "lieutenant" to Petitioner, or Petitioner as a "leader/organizer" over Clash.  Moreover, there's only definitive evidence that Clash received at least 3 kilograms of cocaine from Petitioner, (and no more) or the amount which Clash testified that he sold to Young in 1998 during the time frame that Petitioner served as Clash's supplier. (See Ex. 5, pg. S-13 @ 10-13)

A fortiori, and perhaps more troubling, is the fact that Clash's 1/26/11 testimony actually unveils that Petitioner was falsely sentenced for more than 150 kilograms of cocaine, and that arguably, Clash served as a leader over Petitioner, who made the "executive decision" to deprive Petitioner of a cocaine supply, which would and did have the effect of obviating the alleged "Rice Organization" from distributing cocaine.  It must be remembered, that Petitioner's cocaine supply dried up in October of 1998 (Ex. 5, S-13 @ 2-6), and apparently through 2002, afer Clash had became acquainted with Anthony Leonard and the Los Angeles Mexican supplier and began supplying Petiitoner briefly (quantity not specified) from early 2002 until arguably before July 2002, the date which Clash testified that he briefly decided to get out of the drug business. (See Ex. 5, S-21 @ 15-25, S-22 @ 12-14, S-25 @ 3-14)  Once Clash engaged in business with Leonard and the Los Angeles Mexican supplier, Clash became his "own man," sold cocaine to Darnell Young regularly (Ex. 5, S-15 - S-16, S-18 @ 2-9) and entered into his own conspiracy with Travis Golder, Leonard, Young and the Los Angeles Mexican supplier (at the very least), which Petitioner not only wasn't involved with, but which Clash as one point kept a secret from Petitioner after Clash decided not to supply Petitioner and instructed Young and Golder to keep it a secret from Petitioner as to who was supplying Young. (Ex. 5, S-28 @ 9-14, S-29 @ 10-13)  When Clash made the "executive decision" to excise Petitioner's cocaine supply because Petitioner was allegedly too flashy (Ex. 5, S-27 @ 13-25), it illustrated that not only did Petitioner have no "take" in the 200 kilogram shipment (Ex. 5, S-27 @ 13-15), but also that Petitioner was Clash's subordinate whose cocaine distribution vitality was liken to a newborn dependent upon its mother, with Clash exercising a leadership or organizer role over Petitioner, contrary to the indictment's accusation of Petitioner being the leader of the alleged "Rice Organization."  Some leader Petitioner proved to be, a man whose alleged lieutenant excised from his own alleged organization, then Clash went on

to establish his own conspiracy with Leonard, Golder, Young and the Los Angeles supplier and then instructed Young and Golder to keep it a secret from Petitioner. The foregoing representing a putrid tale, but nonetheless unequivocally candid.

Moreover, the timeline of Clash's cocaine distribution is telling as well apropos of Petitioner being falsely sentenced for more than 150 kilograms of cocaine. The commonplace theme gleaned from Clash's 1/26/11 testimony was that of cocaine supply being inconsistent, often times drying up for both Petitioner and Clash from 1998 until 2002. Remember, there's no evidence that Petitioner sold Clash more than 3 kilograms in 1998 until Petitioner's cocaine supply dried up in October of 1998. (See Ex. 5, S-13 @ 2-13) It's safe to further assert that via Clash's testimony it can be ascertained that Petitioner's cocaine supply had diminished also throughout 2002 until Clash met Leonard and the Los Angeles supplier in 2000 and started to supply Petitioner in early 2002 until July 2002 when Clash decided not to supply Petitioner with cocaine at all. (See Ex. 5, S-13 @ 2-25, S-14 - S-15, S-17 @ 14-19, S-21 @ 8-12, S-21 @ 15-25, S-22 @ 1-2, S-22 @ 12-14, S-27 @ 13-15) Petitioner's inability to keep a supply from October of 1998 until he started being supplied by Clash (his alleged lieutenant) in early 2002, an expanse of more than 3 years, caused Petitioner to lose Clash as a customer and compelled Clash to secure his own supply from Los Angeles, which spelled the beginning of Clash's own prolific rise and prominence as a leader of his own cocaine conspiracy which he kept secret from Petitioner. Not only did Petitioner's supply of cocaine dry up for more than 3 years, but the independent Clash's supply of cocaine experienced at least 3 "vegetation killing" droughts from 1998 - 2002, which killed the prospects of Clash flourishing from cocaine distribution for most of 1999 thru 2001. Clash's testimony, relative to his timeline of cocaine distribution both from being supplied by Petitioner and Clash supplying Petitioner doesn't even depict 15 kilograms, let alone the more than 150 kilograms that Petitioner falsely pled guilty to so that he could avoid a

14

life sentence based upon lies.

Petitioner was the victim of a due process violation, as it is irrefutable that Petitioner was sentenced based upon more than 150 kilograms of cocaine and a 4 point leadership upward departure pursuant to U.S.S.G. 3B1.1(a) (Ex. 3, pg. 77 @ b(3) & b(5)), facts which were "(1) false or unreliable and (2) demonstrably made the basis for the sentence," satisfying both prongs enunciated in Jefferson v. Berkebile, 688 F.Supp.2d 474, 485 (S.D.W.Va. 2010) Clash's 1/26/11 testimony clearly unveiled that Petitioner had cocaine supply delimmas, and that via Clash's testimony, that Petitioner was responsible for selling far less than 50 kilograms of cocaine (more like 15, or that he was ever involved with knowingly, more than 15 kilograms) let alone the astronomical amount of more than 150 kilograms which Petitioner was coerced into pleading guilty to so that he could avoid a possible life sentence behind lies. The pattern of lies relative to the more than 150 kilograms of cocaine allegation against Petitioner also calls into question the 30 kilograms of heroin which Petitioner also reluctantly pled guilty to so that he could avoid a life sentence, which there is no true evidence to support either. An evidentiary hearing is necessitated to confidently assess not only these drug quantities which are false, but the government's possible knowing use of perjury before a grand jury and thier failure to correct materially false information against Petitioner which violated due process, as the U.S. Attorney's Office in Baltimore at least learned of Clash's testimony, which establishes that Petitioner was not a leader of 5 or more individuals and did not distribute even close to 150 kilograms of cocaine, evidence unveiled at Young's 1/26/11 sentencing.

We must not forget, that Leonard and Steven Campbell (Campbell of which Petitioner doesn't even know and Leonard whom Petitioner never did any business with) were alleged to be Petitioner's suppliers, and Eric Clash's 1/26/11 testimony actually substantiates that Clash was Petitioner's supplier momentarily, and ergo, Petitioner could not be said to be a leader or organizer over those 3 individuals.

Petitioner doesn't even know Chet Pajardo, Campbell, and had no dealings with
Pajardo, Capbell, Leonard or Michael Felder and therefore must be excluded from
the determination as to Petitioner being a leader over them.  Any remaining
relationships between Petitioner and other named codefendants can only be viewed
as buyer-seller relationships (excluding Eric Hall, it wasn't alleged that Hall
had actual narcotics dealings with Petitioner), and thus Petitioner asserts that
in light of such, combined with the fact that Clash's testimony establishes that
Petitioner was not in fact a leader over Clash, Leonard, Campbell and others who
were aforementioned, that at most, Petitioner should have received a 2 point
leadership role pursuant to U.S.S.G. 3B1.1(c) as opposed to the 4 point leadership
role which was falsely imposed upon Petitioner.  Vacatur of Petitioner's sentence
is warranted based on the foregoing, in toto.

It is apparent that the false information concerning Petitioner's alleged
cocaine involvement is what largely influenced the government to bring this progeny
prosecution against Petitioner, for it must be remembered that Petitioner pled
guilty to "heroin distribution" in a plea agreement offered by the government
previously on May 6, 2004 which summoned a 135 month sentence against Petitioner
(see Ex. 1, Docs. 31 & 39 in case 1:04-CR-0084) which should be referenced as the
"progenitor prosecution."  Absent the lies concerning Petitioner's involvement in
distribution of more than 150 kilograms of cocaine and being a leader of such, it
is a safe proposition that the government would  have been satisfied with
Petitioner's then 135 month prison sentence, which involved his conspiracy with
his brother to distribute at least 3 but less than 10 kilograms of heroin, and
where neither were alleged to be a leader or organizer, (See Ex. 1, pg. 4
Sections 6(a) & 8) safe to say because that was the plea offered to Petitioner
and accepted by him before the mendacious cocaine and leader assertions were
thrust against Petitioner.  Petitioner also asserts the foregoing because his
then 135 month sentence for 3 but less than 10 kilograms of heroin was nearly

3 times more than the 48 month sentence that Clash received for more than 1,500 kilograms of cocaine.  Due to the lies of the progeny prosecution, this compelled the government to file a 21 U.S.C. 851 Information to seek a mandatory 20 year sentence, which ultimately resulted in a 30 year term against Petitioner.  Based on the foregoing, Petitioner requests nunc pro tunc relief where Petitioner requests vacatur of his sentence and reinstatement of his 135 month sentence for the 3 to less than 10 kilograms of heroin he initially pled guilty to and dismissal of both the 851 Information and the 4th S.S. Indictment filed subsequent to the imposition of Petitioner's 135 month sentence, as both filings against Petitioner was premised upon materially false information after the government was satisfied with Petitioner's 135 month sentence for the less than 10 kilograms of heroin. (The 30 kilograms of heroin admittance by Petitioner in the progeny prosecution was coerced, based on false information and only accepted so that Petitioner did not receive a life sentence based upon mendacious information which he could not prove at the time.)  Restoring Petitioner's 135 month sentence due to the false facts which embody the progeny prosecution is also practicle for another reason. Petitioner's 30 year sentence is the product of Petitioner pleading guilty to counts 1 thru 3 of the 4th S.S. Indictment alleging cocaine and and heroin distribution (1 kilogram or more of heroin) (Ex. 6, count 1, Ex. 7 count 2) and a one count information alleging conspiracy to distribute 1 kilogram or more of heroin (See Ex. 3, pg. 1'pg. 1 of 10/17/06 plea agreement, paragraph 1) with the heroin offense conduct in count 1 of the information, conspiring to distribute 1 kilogram or more of heroin, being the same offense conduct which comprises counts 1 and 2 of the 4th S.S. Indictment Petitioner pled guilty to. (Ex. 6 & 7)  By pleading guilty to the information, it is necessarily meant that Petitioner was waiving his right to prosecution by indictment pursuant to F.R.Crim.P. 7(b) (See Ex. 8, F.R.Crim.P. 7(b)), therefore, having the effect of nullifying the 4th S.S. Indictment against Petitioner.  Petitioner raises not the F.R.Crim.P. 7(b)

17

violation to assert a claim, but rather, to illustrate the the 135 month nunc pro tunc relief based upon the materially false leader role and more than 150 kilograms of cocaine allegation is also reasonable as a remedy pursuant to Petitioner's plea to the one count information which in effect nullified his plea to counts 1 and 2 of the 4th S.S. Indictment, and his right to prosecution to indictment, period, pursuant to F.R.Crim.P. 7(b). Based on the foregoing, Petitioner requests vacatur of his sentence with remand for resentencing after a comprehensive evidentiary hearing.

## C. CLEAR AND CONVINCING EVIDENCE ILLUSTRATES THAT PETITIONER IS ACTUALLY INNOCENT OF THE 4 POINT LEADER AGGRAVATING ROLE (U.S.S.G. 3B1.1) AND OF CONSPIRACY TO DISTRIBUTE 150 KILOGRAMS OF COCAINE OR MORE.

In the Fourth Circuit, U.S. v. Maybeck, 23 F.3d 888, 892-94 (4th Cir. 1994) and U.S. v. Mikalajunas, 186 F.3d 490 (4th Cir. 1999) represent the stare decisis authorizing a defendant to assert that he is actually innocent of his sentence. "The Supreme Court has held that when a petitioner is claiming actual innocence of a sentencing factor, they are held to a much higher standard than petitioner's claiming actual innocence of their underlying crime." (See White v. Rivera, 2009 U.S. Dist. Lexis 44397 (4th Cir. 2009) (citing Calderon v. Thompson, 523 U.S. 538 (1998)) The Fourth Circuit has explicitly said that that a petitioner claiming actual innocence of an underlying sentencing factor must do so by "clear and convincing evidence." (White v. Rivera, supra) (citing Buckner v. Polk, 453 F.3d 195 (4th Cir. 2006)) As is required with any claim of actual innocence, Petitioner couples his claim of actual innocence of sentencing factors with his Constitutional 5th Amendment Due Process violation claim which was birthed due to Petitioner being sentenced based upon materially false information. (Leader 4 point aggravating role and more than 150 kilograms of cocaine)

Eric Clash's 1/26/11 testimony at Young's sentencing (Ex. 5) more than 4 years after Petitioner was sentenced to 30 years imprisonment, inter alia, provides that clear and convincing evidence of actual innocence. Eric Clash,

the man who received a 48 month sentence (and who has been home now for years)
after admitting to conspiring to distribute more than 1,500 kilograms of cocaine,
(Ex. 5, S-38 @ 1-7), S-40 @ 8-12) obviously had a mammoth motive to absolve himself
as a leader in the charged conspiracy and to cooperate by fabricating evidence
against Petitioner, that being, to avoid a life sentence for offense conduct far
more substantial than Petitioner and to be miraculously rewarded with a sentence of
4 years which he recieved.  The 4.5 - 9 ounce quantities which Petitioner sold to
Clash for part of 1998 was nominal (considering the 150 or more kilogram amount)
and was at least 3 kilograms (no evidence of more however), the amount which
Clash sold to Young in 1998 during the brief time that Petitioner supplied Clash.
(But no evidence of even 10 kilograms)  Because Petitioner's supply of cocaine
dried up in October 1998, Clash's cocaine distribution also ceased until the end
of 1999 when Clash began being supplied by Leonard and the Los Angeles Mexican
supplier. (Ex. 5, S-13 thru S-15)  In that, we glean that Clash didn't let Petitioner's
failures in securing a cocaine supply to thwart his (Clash's) progress.  From this
was also can view that Petitioner was also not supplied by Leonard from October
1998 until late 1999, because if Petitioner would have been supplied by Leonard
during that time, Clash would still have been Petitioner's customer from 1998 - 1999.

Clash's 1/26/11 testimony establishes that Petitioner was excised from the
"cocaine loop" from late 1998 until 2002, until Clash had obtained a cocaine supply
from his Los Angeles supplier again in 2002, after nearly a 2 year drought
subsequent to the first one year drought.  Clash's rise in 2002 was to that of
Petitioner's supplier briefly in 2002, (Ex. 5, S-22 @ 12-14) indicative of
Petitioner being a subordinate of Clash. (With no drug quantites alleged by Clash
in re his dealings with Petitioner, but the 50 kilograms Clash obtained in 2002,
we know that Clash had multiple named customers, Petitioner, Golder, Young and
it is reasonable to conclude, unnamed customers.  This illustrates that Petitioner
didn't get 50 kilograms of cocaine from Clash in 2002, not even close.)  But material

is the fact that Petitioner didn't receive any of the 200 kilogram shipment Clash
was involved with in the Fall of 2002, with Clash deciding to sever his cocaine
ties with Petitioner due to Petitioner allegedly being too flashy, (Ex. 5, S-25,
S-27 @ 13-25)  This "executive decision" to excise his cocaine relationship with
Petitioner is perhaps the most vivid substantitation that Clash was in fact a
leader over Petitioner (and arguably that Petitioner was not in a conspiracy with
Clash), not vice versa.  But when Clash instructed Young and Golder to conceal
from Petitioner the fact that Clash was in fact Young and Golder's supplier (Ex.
5, S-28 @ 9-21, S-29 @ 10-13) this substantiates that Petitioner wasn't even in a
cocaine conspiracy with Clash, Leonard, Young, Golder, or others.  Clash and
Leonard's "directed cocaine conspiracy" continued absent Petitioner until their
arrest one year after Petitioner was in prison.  Based upon the timeline viewed
via Clash's 1/26/11 testimony, and the droughts experienced by Petitioner, Clash
and Leonard and the nominal amounts of cocaine that Petitioner distributed to Clash
in 1998, and that Clash distributed to Petitioner briefly in 2002, those amounts
didn't total 15 kilograms, as Clash's testimony substantiates.  This constitutes
clear and convincing evidence that Petitioner is actually innocent of the more
than 150 kilograms of cocaine allegation.

    It can be seen that Petitioner was not considered as the leader/organizer
for his heroin dealings, as Petitioner was not given a leader/organizer role in
his progenitor prosecution which summoned his 135 month sentence. (See Ex. 1, pg. 4)
The 4 point leader/organizer role apparently emanates from Petitioner's alleged
cocaine involvement.  However, it was Leonard, Campbell (who Petitioner doesn't
know) Clash, Golder and even Young whose cocaine distribution was far more extensive
and "executive" than Petitioner's, not to mention that Petitioner never led any of
those individuals, but was instead excised from the cocaine business by Leonard/
Campbell and Clash due to cocaine droughts and Clash's decision to deprive Petitioner
from supply.  Leaders in drug organizations arguably secure supply and direct

distribution of such.  Not only could Petitioner not secure cocaine, without a supply her couldn't direct distribution.  Per contra, Clash did just that, viz., decided not to supply Petitioner (Ex. 5, S-27 @ 13-25), but also Clash gave 50 kilograms of cocaine to Golder and told Golder to give 20 of the 50 kilograms to "Nelly." (Young)  Clash's 1/26/11 testimony establishes that Clash and Leonard and at least Golder are leaders/organizers who direct cocaine distribution to whom and how they saw fit, for most of which Petitioner was either excluded from or didn't even know about, at Clash's order to Young and Golder to keep their supplier a secret from Petitioner.  Yet none of the aforementioned individuals received the 4 point aggravating leadership role liken to Petitioner.  Petitioner asserts that Clash's testimony (Ex. 5) illustrates that Petitioner was not a leader/ organizer (just as he (Petitioner) was assessed not to be a leader in his progenitor 135 month sentence prosecution), and that if he could be construed as a leader, that only a 2 point leader enhancement could be applied to Petitioner (at the worst) pursuant to U.S.S.G. 3B1.1(c), as there is no evidence that Petitioner was the leader or organizer of 5 or more people, that he did not direct or make "executive decisions over 5 or more individuals.  As Petitioner is actually innocent of the leader/organizer role enunciated in U.S.S.G. 3B1.1(a) and of more than 150 kilograms of cocaine, Petitioner respectfully requests vacatur of his sentence with remand for resentencing and an evidentiary hearing.

## IV.   CONCLUSION/PRAYER FOR RELIEF

Based on the foregoing, in toto, Petitioner humbly prays and requests that, at the very least, his sentence of 360 months inprisonment, inter alia, be vacated with remand for resentencing.  At the very least, Petitioner requests that the 4 point aggravating role which was applied pursuant to U.S.S.G. 3B1.1(a) be removed, consistent with U.S.S.G. 3B1.1 Application Note 2, as Petitioner was not "the" organizer or leader in the case at bar.  At resentencing, evidence may be adduced by both parties pursuant to U.S.SG. 6A1.3 as to whether an aggravating role

departure is applicable pursuant to U.S.S.G. 3B1.1(b) or (c), which Petitioner asserts as the very worst, perhaps U.S.S.G. 3B1.1(c) may apply. Moreover, prior to resentencing, an evidentiary hearing is necessitated to assess Petitioner's correct base offense level pursuant to U.S.S.G. 2D1.1 due to previous drug quantities attributable to Petitioner being mendacious as is substantiated by Eric Clash's 1/26/11 testimony, inter alia, which was the subject of the instant petition, as the previous drug quantities lack "sufficient indicia of reliability" and offend due process guarantees. A fortiori, Petitioner requests that the 21 U.S.C. 851 Information be vacated and/or withdrawn and that specific performance of Petitioner's initial plea agreement (which summoned a 135 month prison sentence against Petitioner, see 1:04-CR-0084-BEL, Doc. 39), which represents the progenitor prosecution of Petitioner, as the progeny prosecution of Petitioner was founded upon materially false information which prejudiced Petitioner and representes a 5th Amendment Due Process violation. A manifest injustice will find life if the particularized request for relief is not granted.

## V.   DECLARATION

Petitioner hereby declares and swears that the foregoing has been thrust in good faith, so as to do substantial justice, and that all evidence which comprises the instant pleading is authentic and been thrust in good faith and not vexatiously. Moreover, Petitioner hereby swears pursuant to the penalty of perjury that the facts and evidence which comprises the instant pleading is true and correct to the best of Petitioner's knowledge, recollection and capacity. The foregoing sworn to pursuant to 28 U.S.C. 1746.

Respectfully Submitted,

/s/ Howard Rice

Howard Rice
Reg. No. 41214-037
LSCI Allenwood
P.O. BOX 1000
White Deer, PA 17887