IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(BALTIMORE)

| | |
|---|---|
| HOWARD RICE<br>(Movant/Petitioner)<br><br>vs.<br><br>UNITED STATES OF AMERICA<br>(RESPONDENT/GOVERNMENT) | ) CRIMINAL NO.:  1:04-CR-00323-WDQ<br>)<br>) D.J. WILLIAM D. QUARLES, JR.<br>)<br>)<br>)<br>) |

WDQ 12cv3648

---

APPENDIX OF EXHIBITS IN SUPPORT OF
PETITIONER'S 28 U.S.C. 2255(f)(4) MOTION

---

EXHIBITS 1 THRU 8

---

RESPECTFULLY SUBMITTED:


HOWARD RICE
PRO SE PETITIONER
REG. NO. 41214-037
LSCI ALLENWOOD
P. P.O. BOX 1000
WHITE DEER, PA 17887

Ex. 1

Factual and Guidelines Stipulation

6. This Office and the Defendant understand, agree and stipulate to the statement of facts set forth in Attachment A hereto and to the following applicable sentencing guidelines factors:

a. Based on facts readily provable by the Government prior to any statements made by the Defendant, it was reasonably foreseeable to the Defendant and within the scope of the jointly undertaken criminal activity that the conspiracy distributed and possessed with the intent to distribute at least 3 kilograms but less than 10 kilograms of heroin. Accordingly, pursuant to U.S.S.G. §§ 2D1.1(a)(3), 2D1.1(c)(3), and 1B1.3, the base offense level is 34.

b. This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's acceptance of personal responsibility for his conduct. This Office may oppose any adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

c. In accordance with the above, the applicable offense level would be 31.

7. The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

8. This Office and the Defendant agree that no other offense characteristics, sentencing guidelines factors, potential departures or adjustments will be raised or are in dispute.

Obligations of the United States Attorney's Office

9. In consideration of his plea to the above offense, the Defendant will not be further prosecuted criminally by this Office for his participation in a conspiracy to distribute and possess with intent to distribute heroin from in or about the Fall of 2003 through in or about February 2004, as charged in Count One of the Indictment, except for criminal tax violations related to that offense, as to which this

Office cannot, and does not, make any agreement. This Agreement does not provide any protection against prosecution for any crimes except as set forth above.

10. At the time of sentencing, this Office will recommend a sentence within the applicable guideline range. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

11. This Office reserves the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including the conduct that is the subject of the counts of the Indictment that this Office has agreed to dismiss at sentencing.

Waiver of Appeal

12. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed, including any fine, term of supervised release, or order of restitution and any issues that relate to the establishment of the guidelines range, reserving only the right to appeal from an upward or downward departure from the guidelines range that is established at sentencing. Nothing in this agreement shall be construed to prevent either the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35, and appealing from any decision thereunder, should a sentence be imposed that exceeds the statutory maximum allowed under the law or that is less than any applicable statutory mandatory minimum provision. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

Court Not a Party

13. The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

UNITED STATES OF AMERICA,

v.

HOWARD RICE, et al.,

CRIM. NO.: WDQ-04-0323
CRIM. NO.: BEL-04-084
CIVIL NO.: WDQ-06-223

MEMORANDUM OPINION AND ORDER

Pending is Howard Rice's and Raeshio Rice's motion to dismiss the superseding indictment in Criminal No. WDQ-04-0323 and to enforce their plea agreements with the government. Raeshio Rice has also filed a petition under 28 U.S.C. § 2255 (Civil No. 06-223) to vacate, set aside or correct his sentence in Criminal No. BEL-04-084.[1] For the following reasons, the motion to dismiss will be denied, and Raeshio Rice's petition will be granted.

I.   Background

A.   Raeshio Rice's Agreement

On February 19, 2004 Howard and Raeshio Rice were indicted for conspiracy to distribute heroin.

---

[1] Howard Rice also filed a motion under 28 U.S.C. § 2255. On September 8, 2006, the Court granted his oral motion to withdraw his § 2255 motion without prejudice.

1

---

acceptance of responsibility. Ward testified that the beginning of Raeshio's sentencing range would have been 292 months.

Under option three, Ward testified that if Raeshio cooperated he might be able to get 9 years or less. Under the fourth and final option, Raeshio could go to trial and face a possible life sentence.

Ward testified that there was no discussion of Raeshio's culpability for murders during the reverse proffer. Id. at 35.

Raeshio reluctantly decided to accept Option 1. On April 26, Ward received the government's first plea offer and two days later met with Raeshio to review the agreement. Ward testified that he thought the plea meant that the government would not further prosecute Raeshio. Id. at 30-31, 53. Ward understood the final paragraph of the agreement to immunize Raeshio from further prosecution:

    This agreement does not bind any federal, state, or local
    prosecuting authority other than this office. This
    agreement constitutes the complete plea agreement in this
    case. There are no other agreements, promises, undertakings
    or understandings between the Defendant and this Office
    other than those set forth in this agreement, and none will
    be entered into unless in writing and signed by all parties.

Defense Ex. 4, ¶ 14. Raeshio rejected the first plea letter because of its 168-210 month sentence range. See Tr. at 37-38, 44-46.

During his May 5, 2004 telephone conference with Ward, Weinstein extended the May 3, 2004 deadline for accepting Option

3

---

On June 26, 2006, Peter Ward, Esquire, Raeshio Rice's counsel in BEL-04-084, testified that on April 12, 2004 he spoke with AUSA Jason Weinstein. Weinstein suggested that Raeshio would receive an extremely generous plea offer if it was accepted by May 3, 2004. Evidentiary Hearing Tr. ("Tr.") at 22. During their telephone conversation, they scheduled a reverse proffer session for April 19.

On April 19, 2004, Raeshio Rice attended the reverse proffer session. Ward testified that only he took notes at that meeting and charges more serious than those in the pending indictment were discussed. Id. at 25. Weinstein presented four options for Raeshio. Ward testified that under the first plea option, if Raeshio pled to the original indictment by May 3, 2004 then his guidelines calculation would start at base offense level 36, he would receive no upward adjustment for leadership and would receive a three level downward adjustment for acceptance of responsibility, resulting in a 168-210 month guideline range. Ward understood that if Raeshio chose this option, there would be no superseding indictment; this was an attractive option for Raeshio.

Under the second option, if Raeshio pled guilty to the current indictment after May 3, 2004, his base offense level would be 38, he would receive a 2 level upward adjustment for his leadership role and only a two level downward adjustment for

2

---

1, and Ward communicated Raeshio's desire for a 10 year sentence. On May 6, Ward received a new plea offer. Ward thought that the only changes in the offer were in the date by which Raeshio must accept and in a reduction to adjusted offense level 31. Id. at 51. Ward testified that he did not completely read the new plea letter. Id.

The new plea agreement stated:

    In consideration of his plea to the above offense, the
    Defendant will not be further prosecuted criminally by this
    Office for his participation in a conspiracy to distribute
    and possess with intent to distribute heroin from in or
    about the Fall of 2003 through in or about February 2004, as
    charged in Count One of the Indictment, except for criminal
    tax violations related to that offense, as to which this
    Office cannot, and does not, make any agreement. This
    Agreement does not provide any protection against
    prosecution for any crimes except as set forth above.

Defense Ex. 6, ¶ 9. Ward testified that the paragraph was not brought to his attention and that he did not notice it. Tr. at 51. At Ward's urging, Raeshio accepted this new plea offer. Ward understood that the agreement would bar subsequent indictments. Id. at 44, 52 (stating that he believed the first plea offer "took care of the whole situation" and that the second offer was "the same as the original").

Raeshio accepted the new plea offer on May 14, 2004. On January 26, 2005, Raeshio received a 147 month sentence.

Ward was "shocked" when he learned of the superseding indictment, and discussed the case with Raeshio's new attorney. Id. at 66-67.

4

---

Ex. 2

Ward acknowledged that the wording in the plea agreement was clear and—had he read it—he would not have allowed Raeshio to sign the second agreement. *Id.* at 50-51.

### B.   Howard Rice's Agreement

Stephen Sacks, Esquire, Howard Rice's attorney in BEL-04-084, testified about Howard's reverse proffer session on April 7, 2004 at which two homicides were discussed; Howard was also told that if he did not plead guilty, his father would be indicted and the murder investigations would be pursued. *Id.* at 118-19.

AUSA Weinstein presented three options to Howard Rice. According to Sacks, under Option 1, Howard would go to trial based on a superseding indictment and face a likely sentence of 360 months to life. Under Option 2, Howard could plead guilty, cooperate, and receive a four level downward departure. Under Option 3, Howard could plead guilty without cooperation and receive a 14 to 15 year sentence. Sacks thought that Option 3 was a good deal for Howard because it would protect his father from future prosecution and avoid the larger conspiracy.

Under the second and third options, Sacks believed that if Howard pled by May 3, 2004, there would be no superseding indictments or murder prosecution. *Id.* at 127, 165. Indeed, based on conversations with Weinstein at the reverse proffer, Sacks believed that all plea options included immunity. *Id.* at 142. Sacks believed that the only difference between the second

and third options was in the time to be served. *Id.* at 132.

Sacks testified that he attempted to lower the possible sentence by negotiating a lower quantity of heroin to be admitted and by negotiating a lower criminal history for Howard. The plea offer Sacks received on April 23, 2004 contained a 14 to 15 year sentence; this offer was not accepted because Howard wanted a 10 year sentence. An extension of time was requested by Sacks and granted by Weinstein.

The second plea offer was received on May 6, 2004. Sacks reviewed the offer with Howard but did not notice any changes other than the duration of sentence. Sacks testified that this latter agreement contained an additional paragraph that was not pointed out to him. *Id.* at 148-49. He testified that he was unaware of the change but acknowledged that a clear reading of paragraph nine allowed a superseding indictment to be filed. *Id.* at 149. Sacks stated that had he noticed it, the offer would not have been accepted. *See id.* at 153.

Howard accepted the plea offer. On October 27, 2004, Howard received a 135 month sentence.

Sacks was no longer representing Howard when he was shocked by the news of the superseding indictment. *Id.* at 188.

### C.   The Superseding Indictment

On February 1, 2005, the government indicted Raeshio and Howard Rice for racketeering, distribution of a controlled

substance and murder. Two additional superseding indictments[1] have been filed.

### D.   Other Evidence

Joshua Treem, Esquire, was qualified as an expert on federal criminal practice in the District of Maryland and testified that Raeshio and Howard should not have accepted the plea offers because they clearly permitted the prosecutors to seek later indictments. Treem testified that the first plea offers contained no assurances of immunity. *Id.* at 188.

Treem also opined that sometimes immunity is discussed but not set out in writing and it would be reasonable for a defense attorney to assume that in the absence of a writing, an immunity agreement existed if there had been an affirmative representation made by the AUSA. *Id.* at 190. Moreover, he has seen immunity provisions even when the defendant does not cooperate.

Treem opined that the prosecutor should have identified the changes in the plea offers and the defense attorneys should have reviewed the plea offers before their clients accepted them. *Id.* at 197. He testified that in similar situations he has insisted upon written immunity provisions. *Id.* at 199, 202-03.

Howard Rice testified that, upon the advice of Sacks, he

---

[1] In the second superseding indictment, filed on October 11, 2005, the controlled substance was identified as cocaine. The third superseding indictment, filed on August 10, 2006 added additional counts.

believed that he would not be subject to further prosecution if he signed the plea agreement and believed that his failure to cooperate did not bar his immunity. *Id.* at 255, 258-59. Howard testified that the provisions in the second plea offer were not explained to him by his counsel. *Id.* at 260-61.

Raeshio Rice testified that, upon the advice of Ward, he believed that he would not be prosecuted further if he pled guilty. *Id.* at 262. Raeshio could not recall discussing the additional provisions in the plea agreement with his counsel. *Id.* at 262-64.

William Nickoles, a Narcotics Detective with the Baltimore City Police Department, who is deputized for the DEA, testified that the Rice investigation was ongoing after the first indictment was filed. According to Nickoles, authorities were continuing to investigate cocaine and murder charges involving the Rices.

Nickoles testified that, at the reverse proffer sessions, Weinstein never promised that future charges would be avoided if the Rices pled guilty. *Id.* at 270. Rather, Weinstein said that the only way to get immunity was with full cooperation. *Id.*

Charles W. Hedrick, a Senior Analyst with the DEA who has 35 yrs. of law enforcement experience, testified that the reverse proffer was designed to get the Rice brothers to cooperate. He testified that the only opportunity available to the defendants

*Ex. 2*

GOVERNMENT'S EXHIBIT NO. _____1_____

CASE NO. __WDQ-04-0323__

IDENTIFICATION: ____10/19/06____

ADMITTED: _____10/19/06_____

*United States Attorney*
*District of Maryland*
*Northern Division*

---

*Rod J. Rosenstein*
*United States Attorney*

*Steven H. Levin*
*Deputy Chief, Violent Crime Section*

*36 South Charles Street*
*Fourth Floor*
*Baltimore, Maryland 21201*

*410-209-4800*
*TTY/TDD:410-962-4462*
*410-209-4916*
*FAX 410-962-3091*

October 17, 2006

____FILED ____ENTERED
____LODGED ____RECEIVED

OCT 1 9 2006

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

Teresa Whalen, Esq.
801 Wayne Avenue, Suite 400
Silver Spring, MD 20910

Re:   United States v. Howard Rice
      Criminal No. WDQ-04-0323

Dear Ms. Whalen:

This letter confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by October 18, 2006, it will be deemed withdrawn, and this Office will make no additional offers. The terms of the agreement are as follows:

### Offenses of Conviction

1.      The Defendant, your client, agrees to plead guilty to Counts One, Two, and Three of the Fourth Superseding Indictment pending against him, in which he is charged with racketeering, racketeering conspiracy, and conspiring to distribute and possess with intent to distribute five kilograms or more of cocaine in violation of Title 18, United States Code, Section 1962(c), Title 18, United States Code, Section 1962(d), and Title 21, United States Code, Sections 841(a)(1), (b)(1)(A), and 846, respectively. Additionally, the Defendant agrees to plead guilty to a one count Information pending against him, in which he is charged with conspiring to distribute and possess with intent to distribute one kilogram or more of heroin in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A), and 846. The Defendant admits that he is in fact guilty of these offenses and will so advise the Court.

### Elements of the Offenses

2.      The elements of the offenses to which the Defendant has agreed to plead guilty, and which the Government would prove if the case went to trial are as follows:

$Ex. 3$

Teresa Whalen, Esq.
October 17, 2006

instruct the jury that they could not draw any adverse inference from his decision not to testify.

    e.    If the Defendant were found guilty after a trial, he would have the right to appeal the verdict to see if any errors were committed which would require a new trial or dismissal of the charges against him.

    f.    By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

    g.    If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

    h.    By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status.

### Advisory Sentencing Guidelines Apply

5.    The Defendant understands that a sentencing guidelines range for this case (henceforth the "advisory guidelines range") will be determined by the Court pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991-998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range.

### Factual and Advisory Guidelines Stipulation

6.    This Office and the Defendant understand, agree and stipulate to the Statement of Facts which this Office would prove beyond a reasonable doubt as set forth below and to the following applicable sentencing guidelines factors:

    a.    **Statement of Facts**

From at least in or about 1995 and continuing until February 2004, the Defendant was the leader of a narcotics-trafficking organization whose members included, among others, Raeshio Rice, Anthony Leonard, Steven Campbell, Eric Clash, Keenan Dorsey, and Eric Hall (hereinafter the "Rice Organization"), a group of individuals associated in fact which engaged in, and the activities of which affected, interstate and foreign commerce. The Rice Organization constituted an ongoing

5

---

organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

    The Defendant conducted and participated in the conduct of the affairs of the Rice Organization's racketeering enterprise, from at least in or about 1995 and continuing until February 2004, the Defendant participated in a conspiracy with, among others, Raeshio Rice, Anthony Leonard, Steven Campbell, Vernoa Jackson, Eric Clash, Travis Golder, Keenan Dorsey, Chet Pajardo, and Eric Hall to distribute and possess with intent to distribute multi-kilogram quantities of cocaine and heroin in the Baltimore area. The Defendant and his co-conspirators received cocaine from suppliers in California and New York, and heroin from suppliers in New York and elsewhere. The Defendant and his co-conspirators in turn distributed that cocaine and heroin to customers in the Baltimore area and then caused the proceeds of these cocaine and heroin transactions to be collected and transported back to the Rice Organization's suppliers. The locations used by the Defendant and his co-conspirators to conduct these transactions included a car wash on Quantico Avenue and the Red Door Lounge.

    During the period charged in the conspiracy, the Defendant and his co-conspirators distributed and possessed with intent to distribute more than 150 kilograms of cocaine and more than 30 kilograms of heroin.

    The Defendant used the proceeds of those narcotics transactions to finance purchases of, among other things, real property, a Sea Ray boat, and luxury automobiles, including a Ferrari, a Jaguar, a Mercedes-Benz, two BMWs, a Cadillac, a Bentley, and several motorcycles, some of which were registered in the names of nominee owners to conceal their true ownership and to conceal the source of the funds used to purchase these assets.

    The Government's evidence consists of, among other things, testimony by numerous cooperating witnesses; seizures of narcotics, narcotics proceeds, and other evidence; physical surveillance; and electronic surveillance, including audio interception devices in one of the Rice Organization's vehicles and several wiretaps on phones used by the organization.

6

---

Teresa Whalen, Esq.
October 17, 2006

    b.    *Sentencing Guideline Factors*

#### Counts One and Two: RICO and RICO Conspiracy

1) Pursuant to U.S.S.G. § 2E1.1(a), the offense level to be applied to Counts One and Two is the greater of 19 or the offense level applicable to the underlying racketeering activity.

2) The base offense level for the underlying activity is governed by U.S.S.G. §§ 2D1.1(a)(3) and (c)(1). Pursuant to U.S.S.G. §§ 2D1.1(a)(3) and (c)(1), the base offense level is thirty-eight (38), based on the amount of cocaine distributed (more than 150 kilograms), and the amount of heroin distributed (more than 30 kilograms), amounts which were reasonably foreseeable to the Defendant during the course of the conspiracy.

#### Count Three of the Fourth Superseding Indictment and Count One of the Information: Cocaine and Heroin Conspiracy

3) Pursuant to U.S.S.G. §§ 2D1.1(a)(3) and (c)(1), the base offense level for Count Three of the Fourth Superseding Indictment and Count One of the Information is thirty-eight (38), based on the amount of cocaine distributed (more than 150 kilograms), and the amount of heroin distributed (more than 30 kilograms), amounts which were reasonably foreseeable to the Defendant during the course of the conspiracy.

#### Grouping

4) Pursuant to U.S.S.G. § 3D1.2(d), the base offense level for Counts One, Two, and Three of the Fourth Superseding Indictment and Count One of the Information is thirty-eight (38).

5) Because the Defendant was the organizer or leader of criminal activity that involved five or more persons and was otherwise extensive, a four-level increase is warranted, pursuant to U.S.S.G. § 3B1.1(a).

#### Acceptance of Responsibility

6) This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office will not make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease, based on the Defendant's failure to made a timely notification of his intention to plead guilty. This Office may oppose any adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item

7

---

Teresa Whalen, Esq.
October 17, 2006

in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

7) Based on the foregoing, the adjusted offense level would be forty (40).

7.    The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

8.    This Office and the Defendant agree that, with respect to the calculation of the advisory guidelines range and application of the 18 U.S.C. § 3553(a) factors, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines or in 18 U.S.C. § 3553(a) will be raised or are in dispute.

9.    At the time of sentencing, this Office will recommend a sentence of 30 years imprisonment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant. Furthermore, this Office will not object to the Court adjusting the sentence for any period of imprisonment already served on the undischarged term of imprisonment pursuant to U.S.S.G. § 5G1.3(b)(1).

10.    The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including the conduct that is the subject of the counts of the Indictment that this Office has agreed to dismiss at sentencing.

#### Forfeiture

11.    The Defendant agrees to forfeit to the United States all of his right, title, and interest in any and all money, property, or assets of any kind, derived from or acquired as a result of, or used to facilitate the commission of, the Defendant's illegal activities, including all of the right, title and interest of HOWARD RICE, the Defendant, in a 2000 Mercedes-Benz bearing Maryland registration 418BLN.

12.    The Defendant agrees to assist fully the United States in the forfeiture of the foregoing assets. The Defendant agrees to take all steps necessary to pass to the United States clear title to these assets, including but not limited to executing any and all documents necessary to

8

SHL/JMW
2004R00577

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| UNITED STATES OF AMERICA | * | CRIMINAL NO. <u>WDQ-04-0323</u> |
|---|---|---|
| v. | * | |
| | * | (Racketeering, 18 U.S.C. § 1962(c); |
| | * | Racketeering Conspiracy, 18 U.S.C. § |
| HOWARD RICE, | * | 1962(d); Conspiracy to Distribute a |
| a/k/a "Howie," | * | Controlled Substance, 21 U.S.C. § 846; |
| a/k/a "H," | * | Murder in Aid of Racketeering, 18 |
| RAESHIO RICE, | * | U.S.C. § 1959; Conspiracy to Possess a |
| a/k/a "Whip," | * | Firearm in Furtherance of a Drug- |
| a/k/a "Goodie," | * | Trafficking Crime, 18 U.S.C. § 924(o); |
| ANTHONY LEONARD, | * | Possession of a Firearm in Furtherance |
| a/k/a "Ant," | * | of a Drug-Trafficking Crime, 18 U.S.C. |
| a/k/a "Cuzzo," | * | § 924(c); Possession of a Firearm in |
| STEVEN CAMPBELL, | * | Furtherance of a Drug-Trafficking |
| ERIC CLASH, | * | Crime Resulting in Death, 18 U.S.C. § |
| a/k/a "Whiteboy," | * | 924(j); Possession of Firearms by a |
| ERIC HALL, | * | Convicted Felon, 18 U.S.C. § 922(g); |
| a/k/a "E," | * | Possession with Intent to Distribute a |
| GEORGE BUTLER, | * | Controlled Substance, 21 U.S.C. § 841; |
| a/k/a "Dolce," | * | Aiding and Abetting, 18 U.S.C. § 2; |
| MICHAEL FELDER, | * | Forfeiture, 21 U.S.C. §§ 841(a)(1), 846, |
| ROBERT LEE BAKER, | * | and 853; 18 U.S.C. § 982) |
| a/k/a "Pops," | * | |
| CHET PAJARDO, | * | |
| | * | |
| Defendants | * | |
| | * | |

SECOND SUPERSEDING INDICTMENT

COUNT ONE

Racketeering

The Grand Jury for the District of Maryland charges:

1. At certain times relevant to this Superseding Indictment, HOWARD RICE, a/k/a "Howie," a/k/a "H," RAESHIO RICE, a/k/a "Whip," a/k/a "Goodie," ANTHONY LEONARD, a/k/a "Ant," a/k/a "Cuzzo," STEVEN CAMPBELL, ERIC CLASH, a/k/a "Whiteboy," and ERIC HALL, a/k/a "E," along with others known and unknown to the Grand Jury, were members of the RICE ORGANIZATION, a criminal organization which operated in Baltimore and elsewhere, whose members engaged in narcotics distribution and committed acts of violence, including conspiracy to murder and murder.

2. At all times relevant to this Superseding Indictment, HOWARD RICE, a/k/a "Howie," a/k/a "H," and RAESHIO RICE, a/k/a "Whip," a/k/a "Goodie," were the leaders of the RICE ORGANIZATION and were responsible for overseeing the day-to-day operation of the enterprise's narcotics-trafficking activities.

3. At certain times relevant to this Superseding Indictment, ANTHONY LEONARD, a/k/a "Ant," a/k/a "Cuzzo," and STEVEN CAMPBELL were the primary suppliers of cocaine for the RICE ORGANIZATION.

4. At certain times relevant to this Superseding Indictment, ERIC CLASH, a/k/a "Whiteboy," was a lieutenant in the RICE ORGANIZATION who helped manage the day-to-day operation of the enterprise's narcotics-trafficking activities.

5. At certain times relevant to this Superseding Indictment, ERIC HALL, a/k/a "E," was a "hitman" for the RICE ORGANIZATION who committed and attempted to commit multiple contract murders in furtherance of the enterprise.

6. At certain times relevant to this Superseding Indictment, HOWARD RICE, a/k/a "Howie," a/k/a "H," and ERIC CLASH, a/k/a "Whiteboy," were owners of The Red Door Lounge, a bar located at 1000 North Payson Street, Baltimore, Maryland.

2

EX. 4

*Ex. 5*

S-1

```
 1          IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MARYLAND
 2                  NORTHERN DIVISION

 3    _____
                                  )
 4    UNITED STATES OF AMERICA    )
                                  )
 5         v.                     )  Criminal Docket No. WDQ-06-0491
                                  )
 6    DARNELL ANTHONY YOUNG,      )
           Defendant              )
 7                                )
      _____)
 8                              Baltimore, Maryland
 9                              January 26, 2011
                                10:09 AM to 11:45 AM
10         THE ABOVE-ENTITLED MATTER CAME ON FOR
                       SENTENCING
11         BEFORE THE HONORABLE WILLIAM D. QUARLES, JR.

12              A P P E A R A N C E S

13    On behalf of the Government:

14         Tonya Kelly Kowitz, Assistant U.S. Attorney

15    On behalf of the Defendant:

16         Gary Allen Ticknor, Esquire

17    Also present:

18         Detective William Nickols

19

20

21

22              Reported by:

23         Martin J. Giordano, RMR, CRR, FOCR
           U.S. Courthouse, Room 5515
24         101 West Lombard Street
           Baltimore, Maryland 21201
25         410-962-4504
```

S-2

```
 1              PROCEEDINGS OF JANUARY 26, 2011

 2         THE CLERK:  Please rise.  The United States District

 3    Court for the District of Maryland is now in session, The

 4    Honorable William D. Quarles, Jr., presiding.

 5         MS. KOWITZ:  Good morning, Your Honor.

 6         THE COURT:  Good morning.

 7         MS. KOWITZ:  Calling the case of United States

 8    versus Darnell Anthony Young, Criminal Number WDQ-06-0491.

 9    Tonya Kelly Kowitz on behalf of the United States.  Also

10    seated at counsel table is Detective William Nickols with the

11    Baltimore City Police Department.  And we're here for a

12    resentencing.

13         THE COURT:  Ms. Kowitz, Detective Nickols.

14         MR. TICKNOR:  Good morning, Your Honor.  Gary

15    Ticknor on behalf of the Defendant, who is seated to my left

16    at the trial table.  Mr. Young and I are ready to go forward

17    with sentencing this morning, Your Honor.

18         THE COURT:  Thank you.  Ms. Kowitz, I understand you

19    have evidence?

20         MS. KOWITZ:  Pardon?

21         THE COURT:  You have evidence?

22         MS. KOWITZ:  I do, Your Honor.  I plan to call the

23    one witness who I just need about three minutes to get him

24    from -- from a place.

25         THE COURT:  Okay.
```

S-3

```
 1         MS. KOWITZ:  Would this be the time?

 2         THE COURT:  Yes.

 3         MR. TICKNOR:  Well, while they're waiting for that

 4    three minutes, I can put on the record, Your Honor, that we're

 5    still working off of the presentence report that was done for

 6    the original sentencing, and I have two --

 7         THE COURT:  There was a December revision.

 8         MR. TICKNOR:  Okay.

 9         THE COURT:  Which perhaps you should review.  I have

10    a copy, if you --

11         MR. TICKNOR:  Yes, I would love to see that

12    revision, Your Honor, because I don't have that.

13              (Document tendered to Mr. Ticknor.)

14         THE COURT:  Mr. Ticknor, do you need a moment to

15    review the December revision with Mr. Young?

16         MR. TICKNOR:  Yes, Your Honor.  I'm sorry.  I was

17    reviewing it, but -- I looked it over.

18              (Counsel conferring with the Defendant.)

19         THE COURT:  Ms. Kowitz, I think your witness is

20    here.

21         MS. KOWITZ:  Yes, Your Honor.  The Government

22    calls --

23         THE COURT:  We'll wait just a moment until

24    Mr. Ticknor is finished reviewing the December revision.

25         MR. TICKNOR:  Yes, Your Honor.  We have reviewed
```

S-4

```
 1    this, and we do have some revisions.

 2         THE COURT:  Okay.  If you will note them until we

 3    conclude the evidence if you would.

 4         MR. TICKNOR:  Right.

 5         THE COURT:  Please call your witness.

 6         MS. KOWITZ:  Yes, Your Honor.  The Government calls

 7    Eric Clash.

 8         THE CLERK:  Raise your right hand.

 9              ERIC ANTHONY CLASH

10         WAS THEN DULY SWORN TO TELL THE TRUTH

11         THE CLERK:  Please be seated.  State your name for

12    the record, speak directly into that microphone, and spell

13    your name, please.

14         THE WITNESS:  Eric Anthony Clash.

15         MS. KOWITZ:  Thank you, Your Honor.

16              DIRECT EXAMINATION

17    Q.   (BY MS. KOWITZ) Good morning, Mr. Clash.

18    A.   Good morning.

19    Q.   Do you live in the state of Maryland?

20    A.   Yes.

21    Q.   Without telling me where, are you currently working?

22    A.   Yes.

23    Q.   And, generally speaking, what are you doing?

24    A.   Self-employed, running a business.

25    Q.   Are you working regularly?
```

1   A.   Yes.

2   Q.   As in every day?

3   A.   Yes.

4   Q.   Are you on supervised release?

5   A.   Yes.

6   Q.   And what does that mean?

7   A.   I have probation for five years, and I basically have to

8   follow the rules of my probation.

9   Q.   And you said for five years.  Was that following a

10  federal felony conviction in this Court?

11  A.   Yes.

12  Q.   And did you recently return home from having been

13  incarcerated for that same conviction after going to a halfway

14  house?

15  A.   Yes.

16  Q.   And when was that?

17  A.   September.

18  Q.   Of 2010?

19  A.   Yes.  Well, I returned home in March, but left the

20  halfway house in September.

21  Q.   Okay.  Both of the year 2010?

22  A.   Yes.

23  Q.   Okay.  You mentioned probation.  Do you have a probation

24  officer?

25  A.   Yes.

1   Q.   And is that person's name Colleen Stone?

2   A.   Yes.

3   Q.   How often do you have to meet with her?

4   A.   Once a month.

5   Q.   And do you also have to do random drug testing?

6   A.   Yes.

7   Q.   How often is that?

8   A.   Once a week.

9   Q.   And, to your knowledge, have all of your drug checks been

10  clean?

11  A.   Yes.

12  Q.   And, to your knowledge, are you in compliance with all of

13  your conditions of supervised release?

14  A.   Yes.

15  Q.   How old are you now?

16  A.   Thirty-two.

17  Q.   And, at some point in your life, did you start selling

18  drugs?

19  A.   Yes.

20  Q.   How old were you?

21  A.   Fifteen.

22  Q.   Was that approximately 1994?

23  A.   Yes.

24  Q.   Did you graduate from high school?

25  A.   Yes.

1   Q.   Where did you graduate from?

2   A.   Baltimore City College.

3   Q.   Okay.  Briefly tell the Court, if you would, how it is

4   that you got started involved in dealing drugs when you were

5   15.

6   A.   Just being in my environment.  Grew up in the Park

7   Heights community and peer pressure, wanted what was around

8   me, to be part of what was around me growing up.

9   Q.   We talked earlier about a federal conviction.  Were you

10  arrested in February of 2005?

11  A.   Yes.

12  Q.   Did you sell drugs consistently from 1994 until 2005 when

13  you were arrested?

14  A.   Yes.

15  Q.   Okay.  Do you know an individual by the name of Travis

16  Golder?

17  A.   Yes.

18  Q.   Does he have a nickname?

19  A.   Worm.

20  Q.   Okay.  How do you know him?

21  A.   We grew up together in the same community.

22  Q.   What is your relationship, or what was your relationship

23  with Mr. Golder?

24  A.   We were pretty much friends.

25  Q.   Did you have any type of interactions with him having to

1   do with drugs?

2   A.   Yeah.  The whole time that we knew each other, pretty

3   much.

4   Q.   Starting in 1994?

5   A.   Correct.

6   Q.   Okay.  All the way up until you were arrested?

7   A.   To 2003.

8   Q.   Until the year 2003?

9   A.   Yes.

10  Q.   Okay.  And, before you were arrested in the federal case

11  that we discussed, did you smoke marijuana?

12  A.   Yes.

13  Q.   How often?

14  A.   Shew!  Every day.

15  Q.   Okay.  Did there come a time after 1994 in selling drugs

16  that you met Howard -- the Rice brothers?

17  A.   Yes.

18  Q.   What year was that?

19  A.   Around '97.

20  Q.   And describe, if you would, briefly for the Court who the

21  Rice brothers are and how you knew them.

22  A.   Well, I met then at '97, and they were -- we all sold

23  drugs together, and pretty much partied and had businesses

24  together.

25  Q.   From approximately 1997 until when?

Case 1:12-cv-03648-WDQ Document 1-2 Filed 12/12/12 Page 10 of 33
Case 1:06-cr-00491-WDQ Document 96 Filed 03/29/11 Page 9 of 91
Direct Examination of Eric Anthony Clash     5-9

*Ex. 5*

```
1    A.    2002.
2    Q.    Okay.  And, ultimately, the felony conviction you had,
3    did that have to do with your drug dealings and being in a
4    conspiracy with the Rice brothers?
5    A.    Correct.
6    Q.    Did the Rice brothers engage in violence, to your
7    knowledge?
8    A.    Yes.
9    Q.    And how do you know that?
10   A.    I was part of it.  I mean, I was in -- in agreement on
11   different occasions with violence.
12   Q.    Okay.  And did you ever yourself participate in the
13   violence, or was it more agreeing beforehand?
14   A.    More agreeing.
15   Q.    Okay.  Did there come a time when you got arrested in
16   Baltimore City for a drug offense?
17   A.    Yes.
18   Q.    Was that 1999?
19   A.    Correct.
20   Q.    Did you ever spend any time in jail at that time?
21   A.    No.
22   Q.    Okay.  Okay.  So, fast-forwarding to approximately 1998,
23   tell the Court a little bit about your drug dealing
24   activities, your suppliers, what you're doing with it.  Just
25   bring us to 1998.
```

```
1    A.    1998, still selling drugs, cocaine.  At that time, I was
2    getting cocaine from the Rice -- Howard Rice.
3    Q.    Okay.  And what quantities were you selling it in?
4    A.    Four and a half, nine ounces.
5    Q.    Nothing more than that at that time?
6    A.    Nothing more than that.
7    Q.    Okay.  And did you do some of this selling at a car wash
8    in Baltimore City?
9    A.    Yes.
10   Q.    Where was that located?
11   A.    Quantico in Park Heights.
12   Q.    Okay.  Tell the Court a little bit about the car wash.
13   What is it?  What did you do there?
14   A.    It was in the community -- Park Heights community that I
15   grew up in, and we just pretty much hung out, got car washes.
16   It was just like a meeting spot.
17   Q.    But you would also sell drugs there?
18   A.    Correct.
19   Q.    Okay.  Did there come a time towards the end of '97 or
20   early 1998 where you met a person by the name of Darnell
21   Young?
22   A.    Yes.
23   Q.    Where did you meet him?
24   A.    At the car wash.
25   Q.    Did you know him by any other name?
```

```
1    A.    Nelly.
2    Q.    How is it that you met him?  Did someone introduce you,
3    or how did it happen?
4    A.    Just being at the car wash.  We just kind of talked --
5    started talking and conversating from there.
6    Q.    To your knowledge, at that time, did Mr. Young have an
7    involvement with Howard Rice?
8    A.    No.
9    Q.    Okay.  Did there come a time in that year that you
10   started selling cocaine to Mr. Young?
11   A.    Yes.
12   Q.    And when was that?
13   A.    Probably around spring of '98.
14   Q.    And what quantities did you sell to Mr. Young when you
15   first started selling him cocaine?
16   A.    Like four and a half ounces.
17   Q.    Would you typically sell more than four and a half ounces
18   to someone that you just met?
19   A.    Yes.
20   Q.    If they paid you upfront?
21   A.    Correct.
22   Q.    Okay.  Did it ever increase in 1998 from selling
23   Mr. Young four and a half ounces to more?
24   A.    More towards the latter part of 1998, like started being
25   like nine ounces.
```

```
1    Q.    Okay.  And is that the most that you sold him during the
2    1998 time frame?
3    A.    Yes.
4    Q.    Okay.  When you would sell him the nine ounces, would he
5    pay you the full amount, or would you -- or something
6    different?
7    A.    Not always did he have all the money, so I would -- if
8    nine ounces was $6,000 at that time, 6,500 at that time, he
9    might have 4,000 or 5,000, and he would just owe me the rest.
10   Q.    Okay.  And so what would happen?  How would you get the
11   rest?
12   A.    You know, whenever he called and said he had the rest.
13   Q.    And you'd go pick up the money?
14   A.    Correct.
15   Q.    Okay.  And I think you anticipated, but how much did nine
16   ounces of cocaine cost, or how much did you sell it for in
17   approximately '98?
18   A.    Maybe like six -- $6,500.
19   Q.    Did you know from conversations with Mr. Young what he
20   was doing with the cocaine after he bought it from you?
21   A.    I mean, as far as I knew, he was just street-level guys,
22   selling small -- small quantities, you know, of weight is what
23   we called it.
24   Q.    Okay.  Is that like colloquially what you would call what
25   you were doing, selling weight?
```

```
 1   A.   Yes.
 2   Q.   Okay.  Did there come a time in 1998 when your cocaine
 3   supply dried up?
 4   A.   Yes.
 5   Q.   When was that?
 6   A.   Like around October of '98.
 7   Q.   And did that cause you to stop selling cocaine regularly
 8   to Mr. Young?
 9   A.   Yes.
10   Q.   Okay.  So what would you estimate, the quantity of
11   cocaine that you sold to Mr. Young from the spring of 1998 to
12   the fall of 1998?
13   A.   About three keys, maybe.
14   Q.   How often would you meet with Mr. Young during this time
15   frame?
16   A.   Maybe twice a month.
17   Q.   Okay.  So, just so we're clear, from the spring of '98 to
18   the fall of '98, you meet Mr. Young about twice a month, and
19   the quantity ranges from four and a half to nine ounces?
20   A.   Yes.
21   Q.   Okay.  Did the lack of supply of cocaine go through most
22   of 1999, the next year?
23   A.   Yes.
24   Q.   Okay.  So did you sell cocaine to Darnell Young in 1999?
25   A.   No.
```

```
 1   Q.   But were you still selling cocaine to other people in
 2   1999?
 3   A.   Yes.
 4   Q.   Okay.  And were you still selling what we just called
 5   weight to other people?
 6   A.   Yes.
 7   Q.   Okay.  Moving forward to the end of 1999, did you
 8   identify a new source for cocaine?
 9   A.   Yes.
10   Q.   And who was that?
11   A.   My cousin, Anthony Leonard.
12   Q.   Okay.  And where was Anthony Leonard getting cocaine when
13   you first met with Mr. Leonard?
14   A.   Los Angeles.
15   Q.   When you would get it in the prior years from
16   Howard Rice, did that come from outside of Baltimore, or did
17   you know?
18   A.   I didn't know.
19   Q.   Okay.  It was directly you and Howard Rice?
20   A.   Yes.
21   Q.   Okay.  And you say that Anthony Leonard was getting it
22   from L.A.  How do you know that?
23   A.   We were cousins, so it was kind of firsthand
24   communication.
25   Q.   And did you actually meet with folks from L.A.?
```

```
 1   A.   Yes.
 2   Q.   Were they American?
 3   A.   No.
 4   Q.   Okay.  What nationality or ethnicity were they?
 5   A.   Spanish.
 6   Q.   Okay.
 7   A.   Mexican.
 8   Q.   Now, when you identified this L.A. source for cocaine,
 9   did the source have cocaine to sell in larger quantities than
10   what you were buying from Howard Rice?
11   A.   Yes.
12   Q.   A lot larger quantities?
13   A.   A lot larger.
14   Q.   Okay.  And did that mean that you had larger quantities
15   of cocaine to sell to people around here?
16   A.   Yes.
17   Q.   Okay.  And then did that prompt you to start selling
18   drugs to Mr. Young again?
19   A.   Later on, yes.
20   Q.   Okay.  When is the next time that you remember selling
21   drugs to Mr. Young?  What year?
22   A.   2000.
23   Q.   Okay.  What time frame of the year was it that you
24   remember?
25   A.   Around spring 2000.
```

```
 1   Q.   Okay.  Now, just to be clear, from the fall of '98 into
 2   the spring of 2000, did you still see Mr. Young?
 3   A.   Yes.
 4   Q.   Where would you see him?
 5   A.   The car wash.
 6   Q.   Okay.  So you were still in contact with him?
 7   A.   Yes.
 8   Q.   Okay.  And did the quantities that you had been selling
 9   to Mr. Young in '98 change in the spring or summer of 2000?
10   A.   Yes.
11   Q.   Okay.  And so tell the Court, if you would, what
12   quantities of cocaine you sold to Mr. Young in the 2000 time
13   frame.
14   A.   Now he's probably buying -- he's buying a half a key, and
15   I'm giving him -- I'm giving him a half, which equals to a
16   whole key.
17   Q.   Okay.  And, when you say, "key," just to be clear, that's
18   a kilogram of cocaine?
19   A.   Yes.
20   Q.   Okay.  What does a kilogram of cocaine cost at
21   approximately this time?
22   A.   Twenty-four, twenty-five.
23   Q.   So does that mean that Mr. Young would have to give you
24   approximately 12,000, you'd give him the whole key, the
25   kilogram, and he would bring back the rest?
```

```
1    A.   Correct.
2    Q.   Okay.  Did you ever have any problems with Mr. Young
3    getting you the money back?
4    A.   No.
5    Q.   Okay.  Do you know at this time through conversations
6    with Mr. Young of what he's doing with the kilogram quantities
7    of cocaine that you're providing to him?
8    A.   Pretty much selling it as weight.
9    Q.   Okay.  If you could give the Court an example, where
10   would you meet with Mr. Young to give him this quantity of
11   cocaine?
12   A.   The car wash, just different local spots in the area,
13   maybe like the Reisterstown Road Plaza, places like that.
14   Q.   Okay.  Did there come a time in 2000 that your supply
15   dries up and you again stop selling cocaine to Mr. Young?
16   A.   Yes.
17   Q.   When was that?
18   A.   The end of 2000, fall, around October, in that time
19   again.
20   Q.   Okay.  Did you continuously sell cocaine to Mr. Young
21   from the timeframe you testified to, the spring of 2000, to
22   the fall of 2000?
23   A.   Can you repeat that question?
24   Q.   Yes.  I'm sorry.  Did you sell cocaine to Mr. Young
25   consistently from the spring of 2000 to the fall of 2000?
```

```
1    A.   Yes.
2    Q.   Okay.  And how often would you estimate that you met with
3    him per month during that time frame?
4    A.   Probably twice, three times a month.
5    Q.   Okay.  And, if you had to estimate about approximately
6    how many kilograms of cocaine you sold to Mr. Young between
7    the spring of 2000 and the fall of 2000, what would your
8    estimate be?
9    A.   Between ten to fifteen keys.
10   Q.   Could it have been more?
11   A.   Yes.
12   Q.   Do you think it's possible that it was less?
13   A.   Not less.
14   Q.   Okay.  So, you testified that your supply of drugs dried
15   up again in the fall of 2000.  What did you do?
16   A.   In the fall of 2000, I opened a bar.
17   Q.   What was it called?
18   A.   The Red Door Lounge.
19   Q.   And did you have a partner?
20   A.   Yes.
21   Q.   Who was that?
22   A.   Howard.  Howard Rice.
23   Q.   And describe just briefly for the Court:  What kind of
24   bar or lounge was it?
25   A.   It was basically a club, in so many words.  It was a
```

```
1    club.
2    Q.   Was it open at night?
3    A.   Yes, seven days a week.
4    Q.   And you sold alcohol?
5    A.   Sold alcohol, right.
6    Q.   And played music?
7    A.   And played music.
8    Q.   Okay.  Did the club have a DJ?
9    A.   Yes.
10   Q.   And who was that?
11   A.   Nelly.
12   Q.   Okay.  That's the Defendant who is here?
13   A.   Yes.
14   Q.   Okay.  Were you responsible for meeting with Mr. Young as
15   the DJ of the club?
16   A.   Not really responsible.  I mean, it was -- the bar was
17   like open house, so, you know, he was -- he was with us, so he
18   could come at any time.
19   Q.   Did the club -- when it first opened, was it a popular
20   place to hang out?
21   A.   Yes.
22   Q.   And the bar opened in November of 2000.  How long was it
23   open until?
24   A.   2002.
25   Q.   And was Mr. Young the DJ that whole time?
```

```
1    A.   Yes.
2    Q.   How would you describe your contact with him during that
3    time frame?  How regular was it?
4    A.   As far as him being DJ in the bar?
5    Q.   Uh-huh.
6    A.   Almost every day.
7    Q.   Okay.  Now, what's your relationship with Travis Golder
8    at the time?
9    A.   Still friends.  You know, still in communication, still
10   coming down to the bar.
11   Q.   How often would you see Travis Golder?
12   A.   Probably about every day.
13   Q.   Okay.  Did you see or observe anything about Mr. Young
14   and Mr. Golder's relationship?  What was it like?
15   A.   I mean, they pretty much was hanging together every day.
16   Q.   Okay.  Could you describe, from what you saw, Mr. Young's
17   sort of life-style during that time frame, you know,
18   descriptions of any cars that you know he drived, anything
19   like that?
20   A.   I mean, he -- I mean, he had, I think, at the time then,
21   it might have been like a black Mercedes station wagon.  I
22   mean, but just your typical guy.  I mean, always dressed nice,
23   so --
24   Q.   Do you know through any conversations that you had with
25   Travis Golder during that time frame whether Travis Golder and
```

```
 1        Darnell Young are involved in cocaine deals together?
 2   A.   Yes.  With Travis, yes.  I had conversations with Travis.
 3   Q.   Okay.  This is during the time of the Red Door Lounge?
 4   A.   Yes.
 5   Q.   Okay.  But did you yourself sell any cocaine to
 6        Darnell Young in 2001?
 7   A.   No.
 8   Q.   Okay.  Are you selling drugs at all in 2001?
 9   A.   Not really, no.
10   Q.   Did you get involved with heroin at all during that
11        timeframe?
12   A.   Just a little bit of heroin, yeah.
13   Q.   And you never sold heroin to Mr. Young?
14   A.   No.
15   Q.   Okay.  All right.  Turning your attention to New Year's
16        Eve of 2001, turning into 2002, did your source of supply from
17        L.A. have more cocaine for you?
18   A.   Yes.
19   Q.   Had you dealt with this source in the 2001 timeframe?
20   A.   No.
21   Q.   Okay.  So this was sort of --
22   A.   First time.
23   Q.   Okay.  And do you recall whether this was a large
24        shipment of cocaine?
25   A.   Yes, it was a large shipment.
```

```
 1   Q.   About how much?
 2   A.   About 50 keys.
 3   Q.   Okay.  And were you the person that met with the L.A.
 4        source, got the keys, and distributed in Baltimore?
 5   A.   Yes.
 6   Q.   Okay.  Did you sell any of that cocaine to Darnell Young?
 7   A.   No.
 8   Q.   Okay.  Now, now that we're moved forward to '01, turning
 9        into '02, what's your relationship with the Rice brothers?
10   A.   You know, still business partners -- well, me and Howard
11        are still business partners and friends.
12   Q.   And, now that you have your source in L.A., between you
13        and the Rice brothers, who is supplying cocaine to who?
14   A.   I'm supplying to the Rice brothers.
15   Q.   In February of 2002, were you stabbed at a nightclub?
16   A.   Yes.
17   Q.   Okay.  How did that come about?
18   A.   Went to a birthday party at Hammerjack's --
19   Q.   Whose birthday party was it?
20   A.   Kevin Liles' birthday party.
21   Q.   Okay.
22   A.   And got into an altercation with some guys, and I got --
23        ended up getting stabbed.
24   Q.   Who were you with?  Were you with the Rice brothers?
25   A.   Yes.
```

```
 1   Q.   Okay.  And did you have to go to the hospital?
 2   A.   Yes.
 3   Q.   Okay.  Did you at some point find out who it was that
 4        stabbed you?
 5   A.   Yes.
 6   Q.   And who is that?
 7   A.   A guy by the name of -- well, at the time, we knew him as
 8        Bo, but came to find out --
 9             MR. TICKNOR:  I'm sorry.  I couldn't hear that.
10             THE WITNESS:  At a later time we found out -- I
11        mean, at the time, we found out his name was Bo, but later on,
12        we found out his real name was Willie Mitchell.
13   Q.   (BY MS. KOWITZ) Willie Mitchell's real name is Bo?
14   A.   No.
15   Q.   I'm sorry.
16   A.   Bo's real name is Willie Mitchell.
17   Q.   Strike that.  Bo's real name is Willie Mitchell?
18   A.   Yes.
19   Q.   Okay.  And, after you determined that it was Mr. Mitchell
20        who was responsible for the stabbing, was there a plan for
21        retaliation against Mr. Mitchell?
22   A.   Yes.
23   Q.   And were you involved in conversations about that?
24   A.   Yes.
25   Q.   And what was the plan for the retaliation against
```

```
 1        Willie Mitchell?
 2   A.   To get him killed.
 3   Q.   And did that ever happen?
 4   A.   No.
 5   Q.   Okay.  Were you asked to testify at the trial of
 6        Willie Mitchell in this courthouse?
 7   A.   Yes.
 8   Q.   And did you do so?
 9   A.   Yes.
10   Q.   Prior to testifying against Willie Mitchell, did you
11        learn about any reputation of violence that Mr. Mitchell had?
12   A.   Yes.
13   Q.   And what was that?
14   A.   That, you know, he was -- he was a violent guy.
15   Q.   Involved in what level of violence?
16   A.   Involved in murders.
17   Q.   Okay.  And, when you testified in Mr. Mitchell's trial,
18        was there a jury in the box?
19   A.   Yes.
20   Q.   Okay.  And do you know if Mr. Mitchell was ultimately
21        convicted?
22   A.   Yes.
23   Q.   He was?
24   A.   Yes.
25   Q.   Okay.  So, turning your attention now to the July
```

Ex. 5

```
 1    timeframe of 2002, are you recovered from the stabbing?
 2    A.   Yes.
 3    Q.   Okay.  And what, if anything, changes in your life in the
 4    July timeframe of 2002?
 5    A.   Any changes in my life?
 6    Q.   Uh-huh.
 7    A.   I really want to stop selling drugs, so I begin to tell
 8    Travis Golder at the time that I'm no longer going to be part
 9    of selling drugs, and I hooked him up with my cousin, Anthony.
10    Q.   And, now, when you say that you don't want to sell drugs
11    anymore, does that mean you're going to be completely out of
12    it, or somebody else is going to do it for you, and you're
13    still going to financially benefit?
14    A.   I was completely out of it.
15    Q.   Okay.  And did that actually happen?
16    A.   No.
17    Q.   Okay.  What happened in the fall of 2002?
18    A.   We got 200 keys.
19    Q.   From where?
20    A.   L.A.
21    Q.   Same source?
22    A.   Yep.
23    Q.   Okay.  Are you aware whether or not, between July of 2002
24    and the 200 kilogram shipment from L.A., whether, in fact,
25    Mr. Golder worked with Mr. Leonard?
```

```
 1    A.   Yes.
 2    Q.   Okay.  But you weren't involved in that?
 3    A.   No.
 4    Q.   Okay.  So tell the Court, if you could, about the fall of
 5    2002, how you got the information about the 200-kilogram
 6    shipment.
 7    A.   I got a call from Anthony and -- Anthony Leonard.  I met
 8    with him, pretty much said that we had 200 keys, and, you
 9    know, "You could have them to sell."
10    Q.   Okay.  Where are they?  I mean, where are 200 keys?
11    A.   At the time, they were -- at the time, they were at a guy
12    by the name of Steven Campbell's house.
13    Q.   And did you take initially the whole 200, or did you take
14    part of it?
15    A.   I took part of it.
16    Q.   And how much was that?
17    A.   I took 50 at first.
18    Q.   And do you remember what kind of container it was in?
19    A.   Like one of those blue, like Rubber Maid containers.
20    Q.   Okay.  And what did you do with those 50 kilograms?
21    A.   I gave them to Travis and told Travis to give them to --
22    to give Nelly 20 of them, and Travis dealt with the rest of
23    them.
24    Q.   Okay.  And do you know whether Travis, Mr. Golder, gave
25    20 kilograms from that 50 to Mr. Young?
```

```
 1    A.   Yes.
 2    Q.   Okay.  And how do you know that?
 3    A.   Well, he -- one, he told me, and, two, we met up with him
 4    later on -- latter on in this -- in 2003 to pick up money from
 5    the 20 keys.
 6    Q.   Okay.  Where was it that you picked money up from?
 7    A.   At his house in -- Reisterstown Road.
 8    Q.   Okay.  And did it take Mr. Young a while to sell that 20
 9    kilos?
10    A.   Yes.
11    Q.   How long did it take him, if you recall?
12    A.   Until February of '03.
13    Q.   Okay.  So, if you could, tell the Court, out of 200
14    kilos, whether any of that was sold to the Rice brothers.
15    A.   No.
16    Q.   And why was that?
17    A.   Because, at the time, I felt like that the Rice brothers
18    were bringing on a lot of heat with fancy cars and things like
19    that.
20    Q.   Was there anything about how the Rice brothers were
21    living that caused you to want to cut them out?
22    A.   Yes.
23    Q.   And how was that?
24    A.   At the time, Raeshio Rice was driving around with a
25    Bentley, and that was more than enough reason for me not to
```

```
 1    want him to be part of, or want them to be part of it.  I
 2    knew, if I had to deal with one, I had to deal with both.
 3    Q.   And what were you afraid of?
 4    A.   Being here.
 5    Q.   What do you mean by that?
 6    A.   Prison.
 7    Q.   Police?
 8    A.   Yes, correct.
 9    Q.   Okay.  And did you have any conversations with Mr. Young
10    about what he should do if the Rice brothers were to ask him
11    where he got the large quantities of cocaine?
12    A.   Yes.  I told him -- at the time, I told him to -- I told
13    him to say that he was getting it from a friend of -- like I
14    guess a friend of his by the name of Clive or Clyde.
15    Q.   Instead of from you?
16    A.   Right, to say instead of me.
17    Q.   Okay.  And, to you, at this point, who do you understand
18    Clive to be?
19    A.   Somebody he was getting drugs from.
20    Q.   Who was getting drugs from?
21    A.   Darnell.
22    Q.   And how do you know at this time that Darnell Young is
23    getting drugs from somebody named Clive?
24    A.   Well, previously, you know, in the year, we had
25    conversations, you know, me and Worm, or me, him, and Worm.
```

Ex. 5

1  Q.  About that?

2  A.  Yes, correct.

3  Q.  Okay.  And, just to make sure it's clear, when you picked

4  money up for the payment for the 20 kilograms from Mr. Young,

5  whose house was that at?

6  A.  Mr. Young's house.

7  Q.  Okay.  And that's the one you described as being on

8  Reisterstown Road?

9  A.  Correct.

10  Q.  Okay.  Was anybody else present when you had this

11  conversation with Mr. Young about what to say about the kilos,

12  if anyone asked, if the Rice brothers asked?

13  A.  Yeah.  Travis.  Travis Golder.

14  Q.  Okay.  And did Mr. Young have any reaction to that about

15  whether that would be believable or not?

16  A.  No, he didn't have a reaction.

17  Q.  Okay.  Do you know if Mr. Young continued DJ'ing after

18  the Red Door shut down?

19  A.  Yes.

20  Q.  Okay.  And what kind of places that you know of?

21  A.  Parties, clubs.  You know, clubs.

22  Q.  Now, describe if you would for the Court:  Outside of

23  drug dealing activities with the Rice brothers, what other

24  kinds of stuff would you all do together?  Did you have any

25  other sort of social interactions?

1  A.  We gave parties, cookouts, traveled together.

2  Q.  And, when you described these parties and cookouts, did a

3  lot of people come?

4  A.  Yes.

5  Q.  And did you charge them money to come?

6  A.  Yes.

7  Q.  Okay.  If you had to guess, like what was the biggest --

8  like the largest number of people who came to one of your

9  parties?

10  A.  2,500, 3,000 people maybe.

11  Q.  Coming to a party?

12  A.  Yes.

13  Q.  Okay.  And, I mean, why would they come to the party?

14  A.  I guess just wanting to have a nice time.  You know, go

15  out, have a nice party, be at a nice party.

16  Q.  Okay.  And was Mr. Young ever present at any of these

17  parties?

18  A.  Yes.  He was the DJ at most of them.

19  Q.  Okay.  I'm going to show you --

20          MS. KOWITZ:  May I approach, Your Honor?

21          THE COURT:  Yes.

22  Q.  (BY MS. KOWITZ)  I'm going to show you what's been marked

23  as Government's Exhibits 3, 4 and 5.  I'm sorry they're out

24  of number.  Turning your attention first to Grand Jury

25  Exhibit Number 3, what is that?

1  A.  This is a part -- this is a picture of the mansion party.

2  Q.  Okay.  What was the mansion party?

3  A.  It was another party.  We just threw a theme on it

4  calling it a mansion party, because it was somewhat -- it was

5  different, and it was like -- somewhat like a big house, and

6  that was, I think, in August '02.

7  Q.  The year 2002?

8  A.  August '01.

9  Q.  Oh, 2001.  Okay.  Are you in that picture?

10  A.  Yes.

11  Q.  Just so the Court, when the Court sees it, what are you

12  wearing in the picture?

13  A.  Wearing a colorful shirt and a black hat.

14  Q.  And you have pink pants on?

15  A.  And pink pants, yeah.

16  Q.  Okay.  If you could identify Mr. Young in that picture.

17  A.  Yes.

18  Q.  Kind of describe, if you could, for the Court where he is

19  in that picture.

20  A.  He's wearing a colorful shirt, too.

21  Q.  Okay.  Are any other persons that you testified about

22  here today in that picture?  For instance, Mr. Golder?

23  A.  Yeah.  Mr. Golder is there, Howard Rice is there, and

24  Anthony Leonard.

25  Q.  Are all in that same picture?

1  A.  Yes.

2  Q.  Okay.  I'm showing you Government's Exhibit Number 4.  Do

3  you recognize the people in that photograph?

4  A.  Yes.

5  Q.  Where was that picture taken?

6  A.  Same party, mansion party.

7  Q.  And who is in that picture?

8  A.  Worm and Nelly.

9  Q.  Just comparing Government's Exhibit 3 to 4, can you tell

10  that Mr. Young is wearing the same shirt in both of those?

11  A.  Yes.

12  Q.  Okay.  And Mr. Golder's dressed the same?

13  A.  Yes.

14  Q.  Now I'm going to show you Government's Exhibit Number 5.

15  Do you recognize that photograph?

16  A.  Yes.

17  Q.  And who is in that photograph?

18  A.  Worm and Nelly.

19  Q.  Okay.  Do you know where that photograph was taken?

20  A.  Yeah.  Howard's birthday party.

21  Q.  Howard Rice's birthday party?

22  A.  Yes.

23  Q.  Were you present?

24  A.  Yes.

25  Q.  And that's Mr. Golder and Mr. Young in that picture

Case 1:12-cv-03648-WDQ   Document 1-2   Filed 12/12/12   Page 16 of 33
Case 1:06-cr-00491-WDQ   Document 96   Filed 03/29/11   Page 33 of 91
Direct Examination of Eric Anthony Clash
5-33

```
1   together?
2   A.   Yes.
3            MS. KOWITZ:  May I pass these up to the Court, Your
4   Honor?
5            THE COURT:  Yes, thank you.  They are admitted.
6            (Exhibit tendered to the Court.)
7   Q.   (BY MS. KOWITZ)  Just generally, how much would you charge
8   a person to come to one of these parties?
9   A.   20 -- $20.  20, $30.
10  Q.   Were they lucrative to those of you who were throwing
11  them?
12  A.   Yes.
13  Q.   Okay.  So now sort of fast-forwarding to 2004, did anyone
14  that you were involved with get arrested?
15  A.   Yes.  The Rice brothers and Travis Golder.
16  Q.   And you were not arrested as part of that Indictment?
17  A.   Correct.
18  Q.   Okay.  Did there come a time prior to your arrest that
19  Travis Golder came home?
20  A.   Yes.
21  Q.   Okay.  And then did you eventually get arrested?
22  A.   Yes.
23  Q.   Okay.  Was that in February of '05?
24  A.   Correct.
25  Q.   Okay.  And do you recall who was involved -- in your
```

```
1   Indictment against you, who were you involved -- who was
2   alleged to have been in the conspiracy that you were
3   ultimately -- that you ultimately pled guilty to?  What was
4   the Indictment about?
5   A.   Selling drugs and being part of -- and violence, and with
6   the Rice brothers, Anthony Leonard.
7   Q.   And Travis Golder?
8   A.   And Travis Golder, yeah.
9   Q.   Okay.  And, after you were arrested, were you approached
10  by law enforcement asking whether you would be willing to
11  provide substantial assistance to the Government?
12  A.   Yes.
13  Q.   And what was your original response?
14  A.   "No."
15  Q.   Did you eventually change your mind?
16  A.   Yes.
17  Q.   Okay.  And then, after doing so, did you go through a
18  series of sit-down interviews with law enforcement and
19  prosecutors?
20  A.   Yes.
21  Q.   Okay.  When you first sat down for those initial
22  interviews, was there a focus of who you were providing
23  information about at first?
24  A.   Yes.
25  Q.   And who was that?
```

```
1   A.   The Rice brothers.
2   Q.   And did you ultimately, though, provide information about
3   everything that you had been involved in during that
4   timeframe?
5   A.   Yes.
6   Q.   Okay.  And did you ultimately plead guilty?
7   A.   Yes.
8   Q.   Okay.  Showing you what's been marked as Government's
9   Exhibit 1 and 2, do you recognize those documents?
10  A.   Yes.
11  Q.   What are they?
12  A.   Plea agreements.
13  Q.   And what did you plead guilty to?
14  A.   Racketeering, conspiring to sell cocaine and heroin, and
15  distribution.
16  Q.   And, just so we're clear, between February of '05, when
17  you were arrested, and when you pled guilty in court, where
18  were you?
19  A.   Pretrial -- in counties.  Different counties.
20  Q.   You were in jail?
21  A.   Correct.
22  Q.   Okay.  So, for, you know, about 15 months, you were
23  actually in jail?
24  A.   Yes.
25  Q.   Okay.  What happened after you pled guilty?  Where did
```

```
1   you go?
2   A.   When I -- after I pled guilty?
3   Q.   Uh-huh.
4   A.   I was released on pre -- on home confinement.
5   Q.   Okay.  And, without telling -- not exactly where you
6   went, did you do your home confinement somewhere outside of
7   the state of Maryland?
8   A.   Yes.
9   Q.   And why was that?
10  A.   For safety reasons.
11  Q.   Were you allowed to travel when you were on home
12  confinement?
13  A.   Yes.
14  Q.   Okay.  And did you travel anywhere when you were on home
15  confinement?
16  A.   Yes.
17  Q.   Okay.  Did you enter your guilty plea in front of
18  Judge Quarles?
19  A.   Yes.
20  Q.   In this courtroom?
21  A.   Yes.
22  Q.   Okay.  After you pled guilty, were you ever threatened
23  for the fact that you had pled guilty?
24  A.   No.
25  Q.   Did you ever hear about whether there were any
```

Ex. 5

```
1   retaliation efforts against you?
2          MR. TICKNOR:  Objection.
3          THE COURT:  Overruled.
4          THE WITNESS:  Yes.
5   Q.   [BY MS. KOWITZ]  Okay.  And what did you hear, if
6   anything?
7   A.   That -- that someone had put a contract on me.
8   Q.   And what does that mean?
9   A.   Someone's putting out money to get me killed.
10  Q.   And did you ever hear how much money that got up to?
11  A.   Yes.
12  Q.   What was that?
13  A.   100,000.
14  Q.   But did you still continue to cooperate with the
15  Government?
16  A.   Yes.
17  Q.   As part of your plea agreement, what was the maximum term
18  of imprisonment you could have gone to jail for if you hadn't
19  pled guilty?
20  A.   Life.
21  Q.   And did you know whether there was a minimum term that
22  you'd have to serve?
23  A.   Yes.
24  Q.   And what was that?
25  A.   Twenty.
```

```
1   Q.   And was there a quantity of drugs that you agreed to in
2   your Statement of Facts when you pled guilty?
3   A.   Yes.
4   Q.   And what was that?
5   A.   1,500 or more keys.
6   Q.   Of cocaine?
7   A.   Yes.
8   Q.   Now, turning your attention to Government's Exhibit
9   Number 2, is that an amendment to the plea agreement?
10  A.   Does it say, "Amendment"?
11  Q.   Yeah.  So, turning your attention to Government's Exhibit
12  Number 2, does that look similar in terms of --
13         MR. TICKNOR:  We'll stipulate it's a supplement to
14  the guilty plea that is involved in cooperation, if that will
15  help.
16         MS. KOWITZ:  Just trying to --
17         THE COURT:  Stipulated.
18         MS. KOWITZ:  Perfect, Judge.
19  Q.   [BY MS. KOWITZ]  So, turning your attention to
20  Government's Exhibit Number 2, on the first page, what does it
21  say?  What does it read where my finger is pointing?
22  A.   "Obligations of the Defendant."
23  Q.   And is that what you had to do?
24  A.   Yes.
25  Q.   And what were you agreeing to do as part of that
```

```
1   supplement?
2   A.   That I would be truthfully in everything that I
3   discussed.
4   Q.   Did it obligate you to do anything beyond talk to law
5   enforcement?
6   A.   No.
7   Q.   Well, what are you doing right now?
8   A.   I'm talking in front of the Court.
9   Q.   Okay.  Did you have to testify if asked to?
10  A.   Yes.  Oh, yes.  Yes.
11  Q.   Okay.  When you testified in the Willie Mitchell trial,
12  was that part of what you had agreed to do?
13  A.   Yes.
14  Q.   Okay.  And would you have had to testify against the Rice
15  brothers if they hadn't pled guilty?
16  A.   Yes.
17  Q.   Okay.  And is being here today part of the agreement that
18  you made with the Government back then?
19  A.   Yes.
20  Q.   If you had your choice, would you be sitting here today?
21  A.   Absolutely not.
22  Q.   Okay.  Did there come a time when you heard that
23  Darnell Young had been arrested?
24  A.   Yes.
25  Q.   Okay.  And did there come a time when you knew he was
```

```
1   going to be sentenced?
2   A.   Yes.
3   Q.   And did you come to court ready to testify?
4   A.   Yes.
5   Q.   Okay.  Just fast-forwarding for the sake of time, March
6   of 2009, were you sentenced in this case?
7   A.   Yes.
8   Q.   Okay.  And did the Government come in and ask the Court
9   to give you a reduced sentence based on your cooperation?
10  A.   Yes.
11  Q.   And what was your sentence?
12  A.   Forty-eight months.
13  Q.   Where did you serve your time?
14  A.   The remainder of it, in Pensacola, Florida.
15  Q.   A federal facility?
16  A.   Yes.
17  Q.   Okay.  And then you were released in April of 2010?
18  A.   March 2010.
19  Q.   Oh, March 2010.  Okay.  And then you spent time at a
20  local halfway house?
21  A.   Yes.
22  Q.   Okay.
23         MS. KOWITZ:  Your Honor, nothing further.
24         THE COURT:  Thank you.  Cross?
25         MR. TICKNOR:  Thank you, Your Honor.
```

Ex. 5

Case 1:12-cv-03648-WDQ   Document 1-2   Filed 12/12/12   Page 18 of 33
Ex. 5
Case 1:06-cr-00491-WDQ   Document 96   Filed 03/29/11   Page 41 of 91
Cross-Examination of Eric Anthony Clash
S-41

```
1    CROSS-EXAMINATION
2    Q.   (BY MR. TICKNOR) Mr. Clash, you talked a lot about
3    quantities and deals that were made.  Do you have any tally
4    sheets that you personally developed showing how much was
5    given to various and sundry people?
6    A.   No.
7    Q.   Were there any recovered from any searches of your homes
8    or other facilities?
9    A.   No.
10   Q.   Do you have any letters that were written to other
11   individuals in which you talk about what you were doing during
12   the time that you were doing it?
13   A.   No.
14   Q.   Are there any recorded documents whatsoever that you know
15   of that would support what you've said in terms of numbers?
16   A.   No.
17   Q.   Okay.  So essentially what we have here today is your
18   best guess as to what was happening back in 1998, '99, 2000,
19   2001, 2002, correct?
20   A.   Correct.
21   Q.   Is that fair?  Okay.
22        You indicated that, in spring of 1998, you began
23   selling some drugs to Mr. Young.  That was your previous
24   testimony; is that correct, sir?
25   A.   Yes.
```

```
1    Q.   When you say, "spring," do you have a better recollection
2    of when that might have been in 1998?  Was it warm?  Was it
3    cold?  Do you have anything that would allow us to pin down at
4    all when spring of 1998 might have occurred?
5    A.   No.
6    Q.   Okay.  And you indicated that you didn't start selling
7    nine ounces to him until late in 1998; is that right?
8    A.   Yes.
9    Q.   But your supply dried up in October of 1998, so it would
10   have been a short period of time that you were selling nine
11   ounces to him if you started selling late in 1998; isn't that
12   correct?
13   A.   Yes.
14   Q.   Okay.  And, again, going to 2000, you again used the
15   term, "spring."  Can you assist us in any way in determining
16   what month in the spring, or summer, because that was the two
17   questions that were asked -- whether it was spring or
18   summer -- in 2000 when you first started reselling to
19   Mr. Young?
20   A.   May of 2000.
21   Q.   May?
22   A.   Yes.
23   Q.   Okay.  And that continued to fall of 2000?
24   A.   Yes.
25   Q.   Okay.  And do you recall when in the fall of 2000 that
```

```
1    might have been?
2    A.   September, October.
3    Q.   And you didn't sell at all in 2001 to him; is that right?
4    A.   Can you repeat the question?
5    Q.   You did not sell anything to Mr. Young in the year 2001?
6    A.   Correct.
7    Q.   Okay.  These photographs that are taken from these
8    parties that were introduced as Government's Exhibit 3, 4, and
9    5, those were parties in which people came and had a good time
10   and paid an entrance fee; is that right?
11   A.   Yes.
12   Q.   Okay.  And the Defendant was there as a DJ?
13   A.   Yes.
14   Q.   Okay.  And it would not be unusual for someone to take
15   photographs with the DJ?
16   A.   Yes.
17   Q.   Okay.  It wouldn't be unusual to take photographs of
18   anybody under those circumstances?
19   A.   Correct.
20   Q.   Okay.  Now, you've indicated that, when you first started
21   talking to the Government, to the agents and so forth, was
22   sometime in 2005, right?
23   A.   The end of 2005.
24   Q.   Okay.  The end of 2005?
25   A.   December.
```

```
1    Q.   December of 2005.  And, at that time, you were talking
2    about the Rice brothers, because that was the interest of the
3    Government?
4    A.   Correct.
5    Q.   Okay.  But you met with them again in January of 2006;
6    did you not, sir?
7    A.   Correct.
8    Q.   And again in March of 2006?
9    A.   Yes.
10   Q.   And April of 2006?
11   A.   No.
12   Q.   And you had a guilty plea in May of 2006; is that right?
13   A.   Yes.
14   Q.   Okay.  Up to the time of your guilty plea, you hadn't
15   mentioned Mr. Young at all, had you?
16   A.   Yes, I had.
17   Q.   Okay.  Do you know whether the agents wrote down what you
18   said about him?
19   A.   No, I don't.
20   Q.   Okay.  You've not reviewed any of the notes of the agents
21   as to when and where your mention of Mr. Young --
22   A.   No.
23   Q.   -- first occurred?
24        All right.  But, in your guilty plea, in the
25   Statement of Facts, if you'll turn to Government's exhibit on
```

```
1    Page 4, Paragraph 6(a), you mentioned a fair number of people
2    in that Statement of Facts; is that correct, sir?
3    A.   Yes.
4    Q.   Mr. Young's not in that list of individuals, is he, sir?
5    A.   Correct.
6    Q.   Okay.  And this plea agreement was made on May 17th or
7    thereabouts of 2006.  That's the date of the letter.  I'm not
8    sure exactly what date you signed it.  What date did you sign
9    it, sir?
10   A.   I'm not sure.
11   Q.   Okay.  But it was sometime before your guilty plea on
12   May 24th, 2006?
13   A.   Correct.
14   Q.   In this plea agreement, between the original and the
15   supplement, you were supposed to start at Level 38 because of
16   the amount of drugs; is that correct?  Calling your attention
17   to Page 5 and the sentencing guidelines factors under Count 3.
18   A.   Yes.
19   Q.   Okay.  Now, that's based upon the weight of the drugs; is
20   that right?
21   A.   Correct.
22   Q.   Okay.  But you testified against, and you've testified
23   here today that you did, in fact, appear as a witness for the
24   Government in the case of Mr. Mitchell, and you testified at
25   that time that you had been the victim of a stabbing at
```

```
1    Hammerjack's.  Do you recall that?
2    A.   Yes.
3    Q.   And that, as a result of the stabbing at Hammerjack's,
4    rather than going to the police and identifying the person who
5    had stabbed you, you were going to involve yourself with your
6    cohorts to take your own revenge?
7    A.   Correct.
8    Q.   And that the manner in which you were going to take your
9    own revenge was to hire someone, and they would kill this
10   individual; is that correct, sir?
11   A.   Yes.
12   Q.   All right.  Are you aware that, with that testimony and
13   with those facts, that you could have been cross-referenced in
14   your plea to a Level 43 for a solicitation or a murder?  Do
15   you understand that, sir?
16   A.   I didn't understand it.
17   Q.   You did not understand it?  You could have started at
18   Level 43 for being involved in at least one murder or
19   attempted murder?
20        MS. KOWITZ:  Objection, Your Honor.
21   Q.   That was never explained to you, sir?
22        THE COURT:  Basis?
23        MS. KOWITZ:  He said he didn't understand, so now
24   he's just saying so.
25        THE COURT:  Okay.
```

```
1    Q.   (BY MR. TICKNOR)  You didn't understand that at any point
2    in your discussions with your attorney?
3    A.   No.
4    Q.   There was also a retaliation that was taken by cohorts
5    against someone for the kidnapping of your mother.  Do you
6    remember that incident?
7    A.   That's not me.
8    Q.   What's that?
9    A.   That's not me.
10   Q.   Okay.  All right.  So your mother was never kidnapped,
11   and you were never involved in a retaliation against those
12   individuals?
13   A.   No, my mother was never kidnapped, but I do know about
14   the retaliation.
15   Q.   Okay.  And you were involved in the retaliation?  You
16   discussed the retaliation?
17   A.   Yes.
18   Q.   I'm sorry.  Someone else's mother.  It's hard to read
19   some of the blacked-out portions of these notes.  So you were
20   talking to people about that shooting?
21   A.   Yes.
22   Q.   And, in fact, you had the gun at some point with which
23   that shooting occurred; is that right?
24   A.   Yes.
25   Q.   Okay.  And, in that shooting, did someone die?
```

```
1    A.   Well, I don't know if the -- I don't know if the gun that
2    I had was the actual gun or not.
3    Q.   Okay.  But you had one that was the same that you thought
4    was the one that had been used, right?
5    A.   Yes.
6    Q.   Okay.  And you told them about that, thinking that it had
7    been used?  When I say, "them," I mean the agents.
8    A.   Correct.
9    Q.   Okay.  And let's go back to my other question.  In that
10   incident, did someone die?
11   A.   I don't know about that incident.  I mean, I don't know
12   if that was the incident.  I really don't know what incidents
13   you're talking about.
14   Q.   When retaliation was taken against someone for the
15   kidnapping and you received a gun that you thought was used in
16   that retaliation, did that retaliation result in the death of
17   an individual?
18   A.   Yes.
19   Q.   And you're aware that your involvement in planning the
20   death of an individual could have resulted in a cross-
21   reference to murder and Level 43?
22   A.   Now I am aware.
23   Q.   All right.  And you received credit for safety valve in
24   your plea agreement, is that correct, sir, under Paragraph 3
25   of the sentencing guidelines factors?  I think it's -- yes.
```

Ex. 5

Case 1:12-cv-03648-WDQ   Document 17   Filed 12/12/12   Page 20 of 33

Case 1:06-cr-00491-WDQ   Document 96   Filed 03/29/11   Page 49 of 91
Cross-Examination of Eric Anthony Clash
S-49

Case 1:06-cr-00491-WDQ   Document 96   Filed 03/29/11   Page 50 of 91
Cross-Examination of Eric Anthony Clash
S-50

**[Page 49 column]**

```
 1   Paragraph 3, where it says, "SCI.2."  It's at the top of
 2   Page 6, "Because the Defendant meets the criteria of SCI.2"?
 3   A.   Okay.
 4   Q.   Did you understand when you signed this plea
 5   agreement that the criteria for the safety valve is that you
 6   not have more than one point for your prior record?
 7   A.   Correct.
 8   Q.   But, in your prior record, you were convicted of
 9   possession with intent to distribute drugs; is that correct,
10   sir?
11   A.   Correct.
12   Q.   And you were given a probationary period under a PBJ; is
13   that right?
14   A.   Correct.
15   Q.   How long was that probationary period?
16   A.   Eighteen months.
17   Q.   Okay.  And you received that probationary period in 1998.
18   That's when you were convicted, right?
19   A.   Yes.
20   Q.   So you were on probation during the period of this
21   conspiracy?
22   A.   Yes.
23   Q.   And are you aware that, under the sentencing guideline
24   factors, you therefore should not have been given the SCI.2
25   reduction, because, if you have more than one point on your
```

**[Page 50 column]**

```
 1   criminal history, which being convicted of a crime and
 2   receiving probation during the period of the conspiracy would
 3   have precluded -- you should not have gotten that --
 4            MS. KOWITZ:  Objection, Your Honor.
 5            MR. TICKNOR:  All right.
 6            THE COURT:  Sustained.
 7            MR. TICKNOR:  I mean, that's an argument.  Okay.
 8            THE COURT:  Sustained.
 9   Q.   (BY MR. TICKNOR) In any case, after all was said and
10   done, you got a sentence of 48 months on March 9th, 2009, with
11   credit for approximately 15 months, I think.  I mean, it was
12   from February of 2005.  You were locked up until May 24th of
13   2006, right?
14   A.   Yes.
15   Q.   So that's about 15 months' credit that you had?
16   A.   Yes.
17   Q.   You're out, right?
18   A.   Correct.
19   Q.   You're not locked up in any way?
20   A.   No.
21   Q.   And this is approximately two years later, and you got
22   out approximately one year after you were sentenced in this
23   case; is that correct, sir?
24   A.   Yes.
25   Q.   Now, there were forfeitures that were brought against you
```

Case 1:06-cr-00491-WDQ   Document 96   Filed 03/29/11   Page 51 of 91
Cross-Examination of Eric Anthony Clash
S-51

Case 1:06-cr-00491-WDQ   Document 96   Filed 03/29/11   Page 52 of 91
Redirect Examination of Eric Anthony Clash
S-52

**[Page 51 column]**

```
 1   by the United States Government for, among other things,
 2   $154,000 worth of personal items -- jewelry and other things.
 3   Do you recall that?
 4   A.   Yes.
 5   Q.   Did you get any of that back, or was any of that used to
 6   hire an attorney?
 7   A.   Yes.  I got -- well, to pay the balance of my attorney.
 8   Q.   Okay.  And were your houses ever forfeited?
 9   A.   Yes.
10   Q.   Okay.  How many houses did you have?
11   A.   Three.
12   Q.   Okay.  And how many houses were forfeited?
13   A.   One.
14   Q.   Okay.  And the remaining two houses are valued at about
15   $700,000; is that right?
16   A.   Wrong.
17   Q.   Okay.  How much are the remaining two houses valued at?
18   A.   At the time?
19   Q.   At the time.
20   A.   100,000.
21   Q.   How much are they valued at now, if you know?
22   A.   60.
23   Q.   All right.  I ran across something, and it's not very
24   clear.  I preface this that it's not very clear in the notes
25   that I had from the interviews of you, but they seem to be
```

**[Page 52 column]**

```
 1   saying that, during this period of time, you were also selling
 2   handguns?
 3   A.   No.
 4   Q.   Is that correct?  No?  Okay.  Like I say, that was not
 5   clear, and that's why I prefaced it in that fashion.
 6            You said that you had heard that you were
 7   threatened.  Who did you hear that from?
 8   A.   The Government.
 9   Q.   Okay.  So they gave you some information.  Nobody came up
10   to you on the street and said, "Jesus Christ, they're going to
11   shoot you," right?
12   A.   No.
13   Q.   Okay.  The Government told you that they had information
14   that there was a contract.  So all of that came from the
15   Government, and not from your personal knowledge outside of
16   your interplay with them?
17   A.   Correct.
18            MR. TICKNOR:  Thank you.  I have no further
19   questions at this time.
20            THE COURT:  Redirect?
21            MS. KOWITZ:  I just want to clear up one thing, Your
22   Honor, about the gun and the kidnapping, because I
23   actually want to make sure I understand at this point.
24                    REDIRECT EXAMINATION
25   Q.   (BY MS. KOWITZ) Whose mom was kidnapped?
```

1    A.   Howard's.

2    Q.   And were you involved in planning any retaliation for the

3    kidnapping of Howard's mother?

4    A.   Not in planning, no.

5    Q.   Okay.  Did you hear about it after it happened?

6    A.   After the kidnapping, or after the --

7    Q.   After any retaliation.

8    A.   No.

9    Q.   How did you ever know about any attempted retaliation of

10   the person who kidnapped Howard's mother?

11   A.   Years later.

12   Q.   Okay.  So this gun that we're talking about, whenever you

13   had it, did you know that it was going to be used or was used

14   to possibly retaliate against somebody who kidnapped Howard's

15   mother?

16   A.   Yes, I did know that.

17   Q.   When?

18   A.   When -- when I gave it to them, which was '97, I think it

19   was.

20   Q.   Who did you give it to?

21   A.   Eric Hall.

22   Q.   And, when you gave it to Eric Hall, did you know what he

23   was going to do with the gun?

24   A.   I knew what his intentions were, yeah -- what his

25   intentions were.

---

1    Q.   Did he tell you?

2    A.   No, he didn't.

3    Q.   Did you talk about it?

4    A.   No, we didn't.

5    Q.   Okay.  So is it because of this person, Eric Hall, is in

6    the organization that you know he doesn't just collect them?

7    A.   Correct.

8    Q.   Okay.  But did he tell you, "I'm exactly going to use it

9    for this purpose"?

10   A.   No.

11        MS. KOWITZ:  Okay.  No further questions.

12        THE COURT:  Recross?

13                    RECROSS-EXAMINATION

14   Q.   (BY MR. TICKNOR) Did Eric Hall call you and say, "I need

15   to come and pick up some heat," or something like that?  "I

16   need to pick up a gun"?

17   A.   I can't recall how it went down.

18   Q.   But the retaliation that was being planned, that was

19   talked about by people?  People knew about it, right?

20   A.   Yeah, but this was -- I found out later, though, what was

21   really going on, though.

22   Q.   Okay.  If Eric Hall had come to you and said, "I need

23   this gun because I'm going to go shoot someone," would you

24   have given him the gun?

25        MS. KOWITZ:  Objection, Your Honor.

---

1         THE COURT:  Sustained.

2         MR. TICKNOR:  All right.  Thank you.  No further

3    questions.

4         THE COURT:  Thank you.  Good day, sir.  You may step

5    down.

6         (Witness excused.)

7         THE COURT:  Ms. Kowitz, any other evidence?

8         MS. KOWITZ:  No, Your Honor.

9         THE COURT:  Thank you.  I will hear from you.

10        MS. KOWITZ:  Your Honor, as you recall, we are here

11   back for resentencing based on a Fourth Circuit opinion, and

12   I'm actually sort of anticipating an argument that I think

13   Mr. Ticknor is going to make, but I think Mr. Ticknor is going

14   to argue that Your Honor can decide whether or not it wants to

15   rely on this evidence to find a drug quantity based on

16   relevant conduct, and I just would like to cite to --

17        THE COURT:  You will point out the part that says I

18   cannot ignore?

19        MS. KOWITZ:  Yeah.  I would like to just -- I would

20   like to point out that the Government is entitled to establish

21   his relevant conduct through evidence that's not been

22   presented at trial, and the District Court is obligated to

23   consider the evidence, as long as it's reliable, for the

24   purposes of calculating his advisory sentencing guidelines

25   range.  I just wanted to point that out.

---

1         THE COURT:  I think that's well established, yes.

2         MS. KOWITZ:  Your Honor, I think Mr. Ticknor --

3         MR. TICKNOR:  I'm not going to argue that.

4         MS. KOWITZ:  Okay.  Anyway, Your Honor, the

5    Government submits that Mr. Clash's testimony establishes, in a

6    most conservative way, establishes drug quantity for relevant

7    conduct between 15 and 50 kilograms of cocaine.  The

8    Government believes that's a conservative estimate in light of

9    the fact, when a person is convicted of conspiracy or is

10   alleged to have been in a conspiracy, that sometimes the

11   weights that are reasonably foreseeable to him could be

12   attributed to him.  The Government is being conservative in

13   its estimate of probably approximately 38, on the low end, to

14   43 kilograms of cocaine.

15        There is nothing here to suggest that Mr. Clash is

16   incredible in any way.  Mr. Clash has testified in front of a

17   jury in this courthouse, and Mr. Clash has been consistent

18   throughout the information that he's provided to the

19   Government from the beginning of the time that he began to

20   cooperate with the Government.

21        I will proffer to the Court that the report of

22   investigation that Mr. Ticknor was talking about in trying to

23   get Mr. Clash to say that he didn't talk about Mr. Young

24   before he pled guilty, the last interview that's memorialized

25   in this report of investigation is March of '06, and, you

Ex.5

Case 1:12-cv-03648-WDQ   Document 4-2-5   Filed 12/12/12   Page 22 of 33
Case 1:06-cr-00491-WDQ   Document 96   Filed 03/29/11   Page 57 of 91          S-57
Case 1:06-cr-00491-WDQ   Document 96   Filed 03/29/11   Page 58 of 91          S-58

1   know, it's unclear exactly when that may have been, but there
2   is no suggestion that this all came after the fact, that
3   Mr. Young just was something he threw in at the end because it
4   would be helpful to him.  His credibility just should not be
5   at issue, and I think that Mr. Ticknor is likely to make sort
6   of a fairness argument here, and I'm wondering if Your Honor
7   would like me to submit on that until I hear from Mr. Ticknor,
8   or if you'd like to hear from the Government in anticipation
9   of that argument.
10          THE COURT:  I won't require you to anticipate your
11   rebuttal.
12          MS. KOWITZ:  Okay.  Thank you, Your Honor.  I'd like
13   to submit there.
14          THE COURT:  Mr. Ticknor?
15          MR. TICKNOR:  All right, Your Honor.  I was not
16   going to suggest that the Court could ignore the testimony
17   that was given here today.  It's very clear from the opinion
18   that -- a number of things are clear from the opinion, but I
19   want to make sure that they're clear on the record.  One, they
20   said, "By determining that the evidence presented at trial
21   established that Young's crimes involved between 500 grams and
22   less than five kilograms of cocaine, the jury in this case
23   effectively acquitted Young of involvement with the
24   distribution of more than five kilograms."
25          They then say, "There is no requirement that the

1   Government present its relevant conduct evidence at trial, nor
2   is the District Court, at sentencing, bound by the evidence
3   presented at trial when determining the quantity of the
4   relevant evidence."
5          And, finally, they said, "The District Court, when
6   imposing the sentence, did not give an indication that it
7   would have imposed the same sentence even if it were not bound
8   by the jury's drug quantity determination or if the sentence
9   had been within a higher guideline range and the Court had
10   determined that it would be too high."
11          I believe that is the state of the law as it now
12   exists, but I also believe that, at one time when we had
13   mandatory guidelines and Apprendi came along, the idea was
14   that the jury had to make a finding that would not only punish
15   the guilty, but would protect them against the kind of numbers
16   that have been used.
17          I don't have any problem theoretically with the jury
18   making a finding and getting over a particular hurdle to
19   establish a sentencing area and then allowing the Government
20   to patch onto that additional amounts.  Where I intellectually
21   have a difficulty with this is when the jury doesn't find
22   that, and they have apparently or could have tried the case
23   before the jury.
24          The Court saw the jury in this particular case.
25   Would that jury have made the finding that the Government

1   would have wanted to get them up to the higher level?  I think
2   not based upon the transcript I read, because they had things
3   they could have done under those circumstances and chose not
4   to do them.
5          We now have a situation where we can have the jury
6   make one finding, and then the Court can enhance on acquitted
7   conduct, which is essentially what we have here.
8          THE COURT:  That's --
9          MR. TICKNOR:  That's the state of the law.
10          THE COURT:  That's not a new thing in the law.
11          MR. TICKNOR:  It's not a new thing.
12          THE COURT:  I enhanced on the basis of the gun.  He
13   was acquitted on the gun.
14          MR. TICKNOR:  Right.  I agree that you did, sir,
15   and, under Watts, I believe you had the authority to do so.  I
16   just have problems with the amount in this particular case --
17          THE COURT:  That's understandable, Mr. Ticknor.
18          MR. TICKNOR:  -- and I think it --
19          THE COURT:  It rests on testimony.  It rests on
20   testimony rather than on the seizure, which was close, 4.997
21   kilograms, which is obviously what influenced the jury
22   finding, because I guess they essentially ignored the
23   testimony or at least didn't credit it sufficiently beyond a
24   reasonable doubt to get beyond five kilograms.
25          MR. TICKNOR:  Now, I am going to make a fairness

1   argument, Your Honor, and the Government could have
2   anticipated that because of what I filed.  I look at
3   Mr. Clash, who was a major player, no question about it by his
4   own testimony, by his plea agreement that's been introduced.
5   He's involved with a violent organization.  There is no
6   indication whatsoever that my client actually was involved in
7   violence.  There was a gun burp in this particular case, but
8   there was no testimony or evidence that that was ever used in
9   the manner that the one was used in retaliation by Eric Hall,
10   and he's planning -- because he gets stabbed at Hammerjack's,
11   he's planning with them to go out and kill somebody, and he
12   got a sentence of 48 months, of which he served 12, with
13   credit for 15 months before, and I --
14          THE COURT:  Well, you say that as if he wasn't in a
15   jail cell for 15 months before.
16          MR. TICKNOR:  Well, he wasn't -- he was --
17          THE COURT:  He got credit for time served.
18          MR. TICKNOR:  Right.  I understand that, and I'm not
19   making light of that.  I mean, I'm just saying he got 15
20   months, and then he served another 12 months, but we're
21   missing some time here, it seems to me, because that's 27
22   months out of a 48-month sentence.  If they were calculating
23   it that way for my client, he'd be happy about it, but it
24   isn't calculated that way for my client.
25          We also have a person who was theoretically looking

EX. 5

S-61

```
1    at a Level 43 who got some reductions for things that were not
2    brought to the Court's attention. I don't believe, and he ends
3    up at 48 months. I understand the cooperation. I admire the
4    cooperation, I truly do, when somebody is cooperating against
5    a group that has a reputation for violence, and you know the
6    reputation, because you were in there and you were violent,
7    but, nonetheless, in this particular instance, I think he's
8    been treated very well. I'm asking --
9              THE COURT: That's the reward for substantial
10   assistance, Mr. Ticknor.
11             MR. TICKNOR: Yes, I understand that, Your Honor,
12   but what we're saying here is my client went to trial and
13   could be facing -- I mean, the Government has now argued that
14   he should be within the area of 168 to 235 by their latest
15   letter.
16             THE COURT: They've come down.
17             MR. TICKNOR: Yes, they've come down. Frankly, Your
18   Honor, as I have said time and time again in my memorandum,
19   136 is enough, really. I mean, because the way they worked
20   Booker, Gall, et cetera, this District Court's discretion can
21   trump the guidelines and can trump impropriety, if you will,
22   or -- and I really think that the difference between these two
23   people, even though we have substantial cooperation, has
24   gotten to the point where now it's just too high.
25             THE COURT: I will give you a chance to allocute on
```

S-62

```
1    the sentence. Right now, you realize we're discussing the
2    base offense level.
3              MR. TICKNOR: I'm sorry, Your Honor. I was
4    allocuting on anything I could allocute on.
5              THE COURT: I will give you a chance to allocute on
6    sentence.
7              MR. TICKNOR: All right, Your Honor. On the base
8    offense level -- thank you. I had some problems with some of
9    his estimates, Your Honor, frankly. In 1998, he starts in
10   spring, but he's not quite sure when that might be. The drugs
11   dry up in October, and it's late within the year that he gives
12   my client nine grams, but, as I recall his estimate, which
13   makes up part of what the Government is arguing, was -- let me
14   make sure I don't misstate it here -- something around three
15   kilograms.
16             THE COURT: Three kilograms from the spring of 1998
17   to the fall of 1998 was his estimate.
18             MR. TICKNOR: Right. Now, a kilogram is 35.3
19   ounces, and he's giving four and a half ounces a month, or
20   twice a month, or nine ounces a month --
21             THE COURT: Four to nine and a half, he said.
22             MR. TICKNOR: Yeah, but he testified that nine
23   didn't start until late in the year --
24             THE COURT: Yes.
25             MR. TICKNOR: -- and it dried up in October. So,
```

S-63

```
1    assuming that he was getting nine ounces, or giving nine
2    ounces to my client during April, May, June, July, say, that
3    would make --
4              THE COURT: Before you expend a great deal of energy
5    there, the real problems your client has, I think, are the
6    testimony about the spring through fall of 2000, 10 to 15
7    kilograms, and the later period of from '02 to '03, the 20
8    kilograms, which took him until February of '03 to sell. If
9    you wish to talk about the nine and a half ounces, I will go
10   through the nine and a half ounces with you --
11             MR. TICKNOR: Your Honor, all I can say about the --
12             THE COURT: I'll do the four ounces to nine and a
13   half ounce computation if you want, but that's not where your
14   client's problem is in terms of the math.
15             MR. TICKNOR: Your Honor, all I can say about the --
16             THE COURT: I'll do the four ounces to nine and a
17   half ounce computation if you want, but that's not where your
18   client's problem is in terms of the math.
19             MR. TICKNOR: Well, I understand that, Your Honor,
20   but the problem I have is, if we do the math for the earlier
21   one and we look at what he estimated, he's wrong on his
22   estimate.
23             THE COURT: And, therefore, I should not credit
24   greatly the subsequent testimony? I understand your argument.
25             MR. TICKNOR: Well, we should reduce some of these
```

S-64

```
1    on his estimates. If he's wrong in one place, it's possible
2    he's wrong in another. He has no notes, no way of telling you
3    precisely, exactly what happened and when it happened except
4    his best guess. My client's got a lot of time invested in a
5    witness' best guess under these circumstances, and it's part
6    of the problem I have with enhancing by a preponderance, is
7    that, you know, essentially the Government --
8              THE COURT: That's a long-lost battle, Mr. Ticknor.
9              MR. TICKNOR: I know. I understand that, Your
10   Honor, but it doesn't seem quite right under the circumstances
11   where he has an error, or it appears that he has an error
12   earlier on, and then comes up with the numbers that he came up
13   with, Your Honor. I did not spend a whole lot of time on him
14   about the larger numbers, frankly.
15             I did find that, from May to September of 2000, he
16   was allegedly delivering some of these drugs to my client.
17   That's a period of roughly six months, and, again, the
18   estimate is probably high based upon his other testimony.
19             THE COURT: Of course the Government doesn't have to
20   have a great deal of weight to get him into the bottom of the
21   bracket --
22             MR. TICKNOR: Right.
23             THE COURT: -- because you've got almost five
24   kilograms from his seizure at trial.
25             MR. TICKNOR: Yes.
```

```
1        THE COURT:  So you're really talking about a tad
2   over 10 kilograms, and, even assuming some fair amount of
3   discount, you're still easily at the lower end of the bracket
4   of the 15 kilograms.
5        MR. TICKNOR:  And the lower end, so that everybody
6   understands, is 15, so -- I've made my argument.  I think that
7   there is an adjustment that's required, and --
8        THE COURT:  I agree that you're right.  I would not
9   accept the totals at face value.
10       MR. TICKNOR:  All right.
11       THE COURT:  Government, do you want to say anything
12  else?
13       MS. KOWITZ:  The only thing I'd like to say is, to
14  suggest that Mr. Clash was incredible based on estimates from
15  1998 to 2000 and 2002, I don't think the math is so off that
16  it should suggest the incredibility of Mr. Clash.  I think
17  that he was doing his best to give the benefit of the doubt
18  and to not do what he could have done, which is come in here
19  and say, "I sold him 20 every month."  I mean, I think it
20  actually goes to show how accurate and how careful Mr. Clash
21  was frankly trying to be.
22       THE COURT:  Thank you.
23       MR. TICKNOR:  I never said that he was incredible.
24       THE COURT:  I understand.  At this point, we're
25  trying to determine the base offense level, and I'm
```

```
1   instructed, of course, to consider all relevant conduct.
2        As I noted, on November 6th, 2006, the execution of
3   search warrants at the Defendant's Ottawa Way, Owings Mills
4   residence, the Government recovered 4.997 kilograms of
5   cocaine, referring here specifically to the December 10, 2010
6   revision to the presentence report at Paragraph 13.  The
7   question, then, is:  Has the Government provided evidence
8   sufficient to prove that it's more likely than not that the
9   Defendant should be attributed with at least 15 kilograms of
10  cocaine?
11       I think, on the testimony of Mr. Clash, even
12  considering the possible arithmetic considerations in the
13  spring through fall of 1998, the quantities, I think, are
14  sufficient to establish that it's more likely than not that
15  the Defendant dealt at least 15 kilograms of cocaine, and,
16  again, the presence of almost five kilograms of cocaine on one
17  occasion in 2006 is corroborative of the scale of the
18  Defendant's operations.
19       Accordingly, I find that the appropriate base
20  offense level is Offense Level 34.  That is enhanced by two
21  levels for the firearm, which the Government submitted at
22  trial as sufficient evidence to convince the Court it was a
23  proper enhancement.  Accordingly, the relevant guidelines are
24  those formed by Total Offense Level 36, Criminal History
25  Category I.
```

```
1        I will hear from the Government on sentencing.
2        MS. KOWITZ:  Your Honor, the Government is asking
3   that the Court sentence the Defendant within the advisory
4   guidelines range.  The Government still submits that that's
5   probably a low estimate of Mr. Young's scale of drug
6   organization activities.  I'll remind the Court there was
7   testimony at trial that, in addition to the five kilograms of
8   cocaine that were in Mr. Young's house, there was also the
9   co-defendant, who was arrested shortly after leaving
10  Mr. Young's house with over $50,000 worth of cash in a red
11  duffle bag.  I think to suggest that Mr. Young was an
12  occasional drug dealer in small amounts of drugs is just not
13  believable.
14       I recognize -- and I guess I'm anticipating, but I
15  recognize the disparity between a 48-month sentence and even
16  the low end of this guidelines sentence, and I think Your
17  Honor sort of hit the nail right on the head.  The current
18  framework without a doubt provides a benefit to those who
19  accept responsibility, accept responsibility early, and do
20  their best to assist the Government in investigations and
21  prosecutions of other individuals.
22       While it could be argued that Mr. Clash and
23  Mr. Young have a great disparity in drug quantity, that
24  disparity is no different in how they appeared before the
25  Court.  Mr. Young went to trial.  He never accepted
```

```
1   responsibility for the five kilograms of cocaine that were
2   found in his house, and he never assisted the Government with
3   any other investigations, and certainly never was a
4   cooperator.
5        I know Your Honor is perfectly aware of these
6   things, but I would like to take just a couple of minutes for
7   the record, that Mr. Clash testified or provided information
8   against the Rice brothers organization, which anyone who is
9   familiar with drug organizations in Baltimore City knows was
10  one of the largest-scale drug organizations during the
11  relevant time period, and was certainly responsible for
12  excessive violence.
13       Mr. Clash also provided information against an
14  individual by the name of Antoine Rich, who was also connected
15  with substantial violence and who had effectively beaten
16  charges like that in the city.
17       He then testified at the trial of Willie Mitchell,
18  which was also a very high-profile, very violent case against
19  another large drug organization in Baltimore City.
20       Mr. Clash, while, you know, maybe for purposes of
21  this, he was not in jail, he was on home confinement in
22  another state away from his entire family to be protected for
23  this, and I think that that's a consideration in determining
24  where Mr. Clash ended up, but I think the disparity in drug
25  quantity between Mr. Clash and Mr. Young is not any bigger or
```

Ex. 5

S-69

```
 1   any more meaningful or any more significant than how Mr. Young
 2   and Mr. Clash presented themselves in front of this Court.
 3              THE COURT:  Thank you, Ms. Kowitz.
 4              Mr. Ticknor, I'll hear from you on sentencing.
 5              MR. TICKNOR:  Yes, Your Honor.  First of all, I
 6   would like to thank the Government for, I think, a restrained
 7   manner in which they presented the factual evidence to this
 8   Court, notwithstanding my previous argument, but I do
 9   appreciate that, and --
10              THE COURT:  Ms. Kowitz is eminently reasonable.
11              MR. TICKNOR:  Now, we had spoken earlier about an
12   objection to the presentence report.  What we were objecting
13   to was, one, the amount that had been established in the
14   presentence report, which is two levels higher than has been
15   proven and accepted by the Court.
16              THE COURT:  The presentence report will be revised
17   to reflect the original base of 34.  The two-level enhancement
18   will be added to that, and the total will be guidelines formed
19   by Total Offense Level 36, Criminal History Category I.
20              MR. TICKNOR:  And also, in as much as Mr. Young was
21   convicted of between 500 grams and less than 5 kilograms on
22   both Count 1 and Count 2, we would move to strike the
23   mandatory minimum of five years for Count 1 on the presentence
24   investigation for Count 1.  It should be five years for
25   Count 1, and five years for Count 2.  It's a technical thing,
```

S-70

```
 1   but that may have an effect upon --
 2              THE COURT:  That revision will be made.
 3              MR. TICKNOR:  All right.  Your Honor, I've
 4   previously gone over the opinion of the Fourth Circuit.  We
 5   wouldn't be here if the Court had indicated or if they had
 6   read into what the Court said, an indication that it would
 7   sentence to the 136 months regardless under the circumstances
 8   of this particular case, and we can do that --
 9              THE COURT:  Well, I tried to make it clear,
10   actually, that I would not have.  I teed it up for the
11   Government's appeal.
12              MR. TICKNOR:  Right.  Yes, Your Honor.  I am still,
13   nonetheless, asking the Court to do so, because it seems to me
14   that, when we have this kind of disparity between what's being
15   proven at the trial and what's being sentenced to in the
16   sentencing guidelines or in the sentencing hearing, Your
17   Honor, what you have is a relatively small dog and a very
18   large tail, and the tail is wagging it.  It's *Pennsylvania
19   versus McMillan* kind of stuff, in that what we have is -- and
20   I won't cite to that for reasons known to the Court, but it
21   seems to me that, you know, it's the wrong way.  The whole
22   *Apprendi* revolution was under the idea that we would promote
23   having the juries determine some of this stuff, and --
24              THE COURT:  That was fleeting, wasn't it,
25   Mr. Ticknor?
```

S-71

```
 1              MR. TICKNOR:  What's that?
 2              THE COURT:  That was fleeting, wasn't it?
 3              MR. TICKNOR:  It was, but I really enjoyed it, Your
 4   Honor, and the fact that he was there at a time when that was
 5   in existence, you know, it does sort of give me a chance to
 6   ask that it be tacked on in this particular instance, Your
 7   Honor.
 8              We've got a six-year conspiracy here from 1997 to
 9   2003.  Granted that some of the drugs occurred in one large
10   chunk and the others occurred during the one-year period.
11   Nonetheless, you know, when you have to extrapolate out over a
12   long period of time, that gives a basis for a variance, Your
13   Honor.
14              We have some post-incarceration rehabilitation to a
15   certain degree in that he has been involved actively in the
16   Education Over Incarceration Program, in which he mentors
17   individuals.
18              THE COURT:  And I would encourage him to continue
19   that.
20              MR. TICKNOR:  Yeah.  It's caused some difficulty
21   with some of the other individuals in the Bureau of Prisons
22   who don't particularly care for the fact that he is in the
23   process of rehabilitating himself at the same time that he's
24   mentoring others, and there has been some friction as a result
25   of that.
```

S-72

```
 1              THE COURT:  You describe that well in your briefing,
 2   which I did review.
 3              MR. TICKNOR:  Okay.  You have a 33-year-old man who
 4   has got a strong family background.  Many of them are here --
 5   friends, neighbors.
 6              THE COURT:  I welcome them to this proceeding.
 7              MR. TICKNOR:  And he's going to have that kind of
 8   safety net when he gets out of jail, and I'm asking for that,
 9   because the question for the Court -- I think one of the major
10   questions that's raised is:  Will he be back?  Is this a
11   person who will be a recidivist?
12              I think he has an incredibly strong family
13   background.  He has work that's available.  His agent could
14   probably put him to work next week as a DJ if he were
15   released, but he's not taking that for granted, because he's
16   going to be considerably older when he gets out, and older DJs
17   are not quite as popular.  So he's taking whatever courses
18   were available where he was located to try and learn other
19   things, particularly fiberoptics and computer software.
20              When I have visited him at MCAC, he is upbeat, he's
21   gregarious, he's outgoing, and it's not an act; he's trying to
22   make the best of the situation that he finds himself in.  I
23   think that's important in determining whether this person is
24   going to be back, because he certainly doesn't want to be.  He
25   had no prior criminal record except for, I think, a reckless
```

Ex. 5

**S-73**

1  driving previously.

2       So you've got somebody that's not used to being

3  incarcerated who finds himself now being incarcerated and

4  incarcerated for, at this point, 136 months.  I hope, when we

5  finish with this hearing, that we'll still be in the area of

6  136 months.

7       I just don't think, Your Honor, given not only the

8  leniency that was shown to Mr. Clash, but there was another

9  individual, a Mr. Wynter, who I believe goes by the nickname

10 of Clive, who received 70 months.  You know, we've got Clash

11 getting 48 months, Wynter getting 70 months, and Wynter is the

12 Clive that Clash talked about, you know, that Clive was also

13 dealing with my client.  So you've got the two suppliers who

14 are getting nothing, or relatively nothing, and you are

15 getting my client, because of his inexperience in the federal

16 system, because he felt that the search of his property was

17 inappropriate and that the Court's ruling was incorrect, and

18 he went to trial.

19      I wish I had been there then.  We would certainly

20 have -- there are ways, as the Court knows, of handling that,

21 where you can preserve the right to appeal a pretrial

22 determination and still not get yourself into the kind of bind

23 that he got himself into, and that's no criticism of

24 Mr. Needleman.  Mr. Needleman did an incredibly good job in

25 representing my client at the trial stage, but, nonetheless,

**S-74**

1  there were some options that would be available, and he might

2  have known about those options but for the fact that he's

3  never been here before.

4       The sentence that the Government is asking for

5  through its presentation here today, I think, is just too high

6  under these circumstances.  I understand that the Court is no

7  friend of drug dealers and never has been, but I think that

8  there is a fairness component in this that ought to trigger a

9  variance.  I know it's not usual in this Court, but I would

10 ask for it under these circumstances.

11      THE COURT:  Please advise Mr. Young that he has the

12 right to make a statement.

13      MR. TICKNOR:  Mr. Young, please stand up.  You have

14 a right to make a statement to the Court if you wish.  If you

15 feel that I've covered everything for you, you don't have to.

16 The Court is not going to hold it against you if you don't

17 speak.  If you do want to speak, then now is your time.  This

18 is your allocution.

19      He wants to speak, Your Honor.

20      THE COURT:  Good morning, sir.

21      THE DEFENDANT:  I'd like to thank everyone who came

22 out today, all my family and friends, and I want to thank you,

23 Your Honor, for the leniency you showed me the first time.

24 I'd like to thank Mr. Ticknor for his hard work, always coming

25 to see me and checking on me and stuff.

**S-75**

1       I just want to say that, you know, this has been a

2  humbling experience for me.  I've learned a lot of things.  My

3  character, my integrity, none of this reflects -- it's

4  really --

5       THE REPORTER:  I'm sorry.  None of this?  None of

6  this?  Say it again.

7       THE COURT:  He couldn't hear you.

8       THE DEFENDANT:  Oh, I'm sorry.  My character, the

9  person that I am, Your Honor, I just made a bad choice, you

10 know.  I've learned from my mistakes.

11      You know, it's really -- really a shame me seeing

12 that the Government would want to punish me even more being as

13 though, you know, my first time.  You know, I never been in

14 prison before.  A month in jail could have taught me my

15 lesson.  I don't want anything to do with drugs.  I don't even

16 want to be around them type of people.  I felt as though I'm a

17 respected person in the community, and me being released into

18 the community, I can change, because I'm someone that the

19 community looks at as a respected person, and I can do a lot

20 more good on the streets than I can in prison, Your Honor, and

21 I just ask that you be a partner with me in my dreams.

22      I'm very passionate about my music, and this

23 situation is really detrimental to me in far ways than prison

24 could ever do to me, Your Honor, and I just ask that you be

25 passionate with me in my dreams and give me a second chance,

**S-76**

1  and I thank you for the leniency the first time.

2       THE COURT:  Thank you.  Please remain standing, sir.

3       The Defendant is 33 years old with one adult

4  conviction for reckless driving, has one child, is a graduate

5  of Edmondson High School, has spent the last 15 years as a

6  self-employed DJ.  He's apparently augmented this employment

7  with the proceeds of a fairly substantial cocaine distribution

8  conspiracy.

9       The jury convicted the Defendant of conspiracy to

10 distribute and possess with intent to distribute 500 grams but

11 less than 5 kilograms of cocaine.  At resentencing, the

12 Government established by a preponderance of the evidence that

13 the Defendant did, in fact, deal in at least 15 kilograms of

14 cocaine.  His base level is adjusted upward by two levels for

15 the possession of a loaded 9mm handgun, yielding a total

16 offense level of 36, Criminal History Category I, and an

17 advisory sentencing range of 188 to 235 months.

18      The Defendant is educated, has marketable skills, no

19 noted drug or alcohol problem, and no significant mental health

20 problems, which leads inevitably to the conclusion that the

21 crime or, in fact, series of crimes, since a continuing course

22 of conduct in dealing drugs was shown, was done purely for the

23 money.

24      The Defense suggested a variance would be

25 appropriate.  The arguments are essentially that I should

Ex. 5

S-77

S-78

1  disagree with or ignore the guidelines.  Of course, I'm not
2  permitted to do that.  Also, they're suggesting that it is
3  unfair to give the Government a second shot with evidence that
4  the jury rejected, but of course the Government can rely on
5  acquitted conduct.
6         The Defense suggests that a variance is appropriate
7  because the Defendant will have a safety net when he's
8  released, but the existence of a safety net -- that is, a
9  group of friends and relatives who are able to help him
10  readjust -- suggests another reason why he should not have
11  engaged in the conduct and is further indication that there
12  was no necessity beyond greed for engaging in the conduct.
13         He suggests and cites the good work that he's done
14  in prison, and, as I said, I do encourage him to continue that
15  good work, and, finally, he notes that Mr. Clash got better
16  treatment.  Unfortunately, when we live in a community where
17  the "stop snitching" culture is alive and well, one of the
18  ironic things that the existence of that culture does is that
19  it raises the value of cooperation, because so few people
20  cooperate, and those people who do cooperate get a much
21  greater reward for that cooperation, because the cooperation
22  is rare, and that is an appropriate use of the executive's
23  discretion to do its difficult job of crime fighting.
24         I find, then, that a sentence at the bottom of the
25  guidelines -- I think this is a case that is appropriately

1  resolved within the guidelines, and find that a sentence at
2  the bottom of the guidelines is sufficient but not greater
3  than necessary to reflect the seriousness of the offenses,
4  provide just punishment for those offenses, and to afford
5  adequate deterrence.  I suspect there is, given the
6  Defendant's age, limited need to protect the public, since the
7  sentence will be sufficiently long that it can be hoped that
8  he will have aged out of the inclination to crime.
9         Accordingly, Mr. Young, on Counts 1 and 2, I impose
10  concurrent 108-month sentences.  I impose on those counts
11  five-year concurrent supervised release terms with the special
12  condition that you provide requested financial information to
13  the probation officer as required.  I waive the imposition of
14  fine, and reimpose the $200 special assessment.
15         Do you understand the sentence, sir?
16         THE DEFENDANT:  Yes, sir.
17         THE COURT:  You have 14 days from today's date to
18  file an appeal.  If you cannot afford to pay a filing fee, you
19  can appeal without paying a fee.  Do you understand that?
20         THE DEFENDANT:  Yes.
21         THE COURT:  Anything further from the Government?
22         MS. KOWITZ:  No, Your Honor.  Thank you.
23         THE COURT:  From the Defense?
24         MR. TICKNOR:  No, Your Honor.
25         THE COURT:  Thank you.  Good luck, Mr. Young.

S-79

S-80

1         THE CLERK:  Please rise.  This Honorable Court
2  stands in recess.
3         (Proceedings adjourned.)
4
5
6  I, Martin J. Giordano, Registered Merit Reporter and Certified
7  Realtime Reporter, certify that the foregoing is a correct
8  transcript from the record of proceedings in the
9  above-entitled matter.
10
11
12  _____        _____
   Martin J. Giordano, RMR, CRR              Date
13

Ex. 5

Ex. 5

Ex. 5

Case 1:12-cv-03648-WDQ   Document 1-25   Filed 12/12/12   Page 30 of 33

Case 1:06-cr-00491-WDQ   Document 96   Filed 03/29/11   Page 89 of 91

S-89

Case 1:06-cr-00491-WDQ   Document 96   Filed 03/29/11   Page 90 of 91

S-90

Case 1:06-cr-00491-WDQ   Document 96   Filed 03/29/11   Page 91 of 91

S-91

Ex. 5

was engaged in, and the activities of which affected, interstate and foreign commerce, did

knowingly, willfully, and unlawfully conduct and participate, directly and indirectly, in the

conduct of the affairs of that enterprise through a pattern of racketeering activity, as set forth

below.

### The Pattern of Racketeering Activity

12. The pattern of racketeering activity, as defined in Title 18, United States Code,

Sections 1961(1) and 1961(5), consisted of the following acts:

### Racketeering Act One – Conspiracy to Distribute and Possess with Intent to Distribute Cocaine and Heroin

13. From at least in or about 1995 through in or about February 2004, in the

District of Maryland and elsewhere, **HOWARD RICE, a/k/a "Howie," a/k/a "H," RAESHIO**

**RICE, a/k/a "Whip," a/k/a "Goodie," ANTHONY LEONARD, a/k/a "Ant," a/k/a "Cuzzo,"**

**STEVEN CAMPBELL, ERIC CLASH, a/k/a "Whiteboy," and ERIC HALL, a/k/a "E,"** the

defendants herein, did knowingly, intentionally, and unlawfully combine, conspire, confederate,

and agree with each other, and with others known and unknown to the Grand Jury, to distribute

and possess with intent to distribute five kilograms or more of a mixture or substance containing

a detectable amount of cocaine, a Schedule II controlled substance, and one kilogram or more of

a mixture or substance containing a detectable amount of heroin, a Schedule I controlled

substance, in violation of Title 21, United States Code, Sections 841(a), 841(b)(1)(A), and 846.

### Racketeering Act Two – Possession with Intent to Distribute Cocaine

14. In or about December 1998, in the District of Maryland, **HOWARD RICE,**

**a/k/a "Howie," a/k/a "H,"** the defendant herein, did knowingly, intentionally, and unlawfully

5

Ex. 6

## COUNT TWO

### Racketeering Conspiracy

The Grand Jury for the District of Maryland further charges:

1. Paragraphs 1 through 10 and 12 through 24 of Count One of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2. From at least in or about 1995 through in or about February 2004, in the District of Maryland and elsewhere,

<div align="center">

**HOWARD RICE,**
a/k/a "Howie,"
a/k/a "H,"
**RAESHIO RICE,**
a/k/a "Whip,"
a/k/a "Goodie,"
**ANTHONY LEONARD,**
a/k/a "Ant,"
a/k/a "Cuzzo,"
**STEVEN CAMPBELL,**
**ERIC CLASH,**
a/k/a "Whiteboy," and
**ERIC HALL,**
a/k/a "E,"

</div>

the defendants herein, together with others known and unknown to the Grand Jury, being persons employed by and associated with the **RICE ORGANIZATION**, an enterprise, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly, willfully, and unlawfully combine, conspire, confederate, and agree with each other, and with others known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as that term is defined in Title

<div align="center">11</div>

18, United States Code, Sections 1961(1) and 1961(5), consisting of an act indictable under Title 21, United States Code, Section 846 (conspiracy to distribute and possess with intent to distribute cocaine and heroin); multiple acts indictable under Title 21, United States Code, Section 841 (possession with intent to distribute cocaine and heroin); and multiple acts indictable under Title 18, United States Code, Section 1959 (murder in aid of racketeering and conspiracy to commit the same). The pattern of racketeering activity through which the defendants agreed to conduct the affairs of the enterprise consisted of the acts set forth in Paragraphs 12 through 24 of Count One of this Superseding Indictment, which are incorporated as if fully set forth herein.

3. It was a part and an object of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

18 U.S.C. §§ 1962(d) and 1963

<div align="center">12</div>

F. R. Crim. P. 7

Rule 7.        The Indictment and the Information

(a) **When Used.**
    (1) *Felony.* An offense (other than criminal contempt) must be prosecuted by an indictment if it is punishable:
        (A) by death; or
        (B) by imprisonment for more than one year.
    (2) *Misdemeanor.* An offense punishable by imprisonment for one year or less may be prosecuted in accordance with Rule 58(b)(1).

(b) **Waiving Indictment.**   An offense punishable by imprisonment for more than one year may be prosecuted by information if the defendant-in open court and after being advised of the nature of the charge and of the defendant's rights-waives prosecution by indictment.

USCSRULE                    1

© 2012 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Ex. 8